RRR FARMS, LTD., Walking Horses of Virginia, Inc., Gilbert Miller, and Donnie May, Appellants,

v.

AMERICAN HORSE PROTECTION ASSOCIATION, INC., Appellee.

No. 14–96–00551–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 6, 1997.

Rehearing Overruled Dec. 18, 1997.

Winston E. Cochran, Jr., Houston, Bruce Rose, Westchester, IL, for appellants.

Gregory R. Ave, Dallas, for appellee.

Before LEE, AMIDEI, and ROBERTSON, JJ. *

## OPINION

AMIDEI, Justice.

This is an appeal from a summary judgment granted in favor of the American Horse Protection Association, Inc. (the Association), appellee. RRR Farms, Ltd., Walking Horses of Virginia, Inc., Gilbert Miller, and Donnie May, appellants, bring four points of error challenging the trial court's judgment. We affirm.

Appellants are involved in the breeding, raising, training, showing, and sale of Tennessee Walking Horses. The Tennessee Walker is a breed known for its high, quick steps and the arcing, broad strides made by the horse's forelegs. Because of its gait, the breed is prized as a saddle horse and has become a highly desirable show horse. According to appellants, the most valuable Tennessee Walkers are those that can perform the "big lick," an exaggeration of the horse's natural gait. A Tennessee Walker with this ability is the one that receives championship honors, the largest stud fees, and brings the best price at sale. Appellants claim that, without the "big lick," the horse is not "spectacular or showy" enough to draw spectators and bidders necessary to sustain the industry.

Only a small number of the horses naturally possess the ability to perform the "big lick," and therefore, the horses have been bred to enhance this trait. Because breeding a trait into a horse is a slow process, owners and breeders have also tried to produce the "big lick" through training. To aid in this training, trainers use certain artificial devices including pads, weighted shoes, and action devices.[1] Many breeds train with these devices, but Tennessee Walkers are actually shown with action devices.

Apparently, there are two factions in the Tennessee Walking Horse industry: (1) the dominant "big lick" faction which consists of breeders, trainers, and fans who admire horses trained to perform with the "big lick" gait; and (2) the smaller "plantation" or "flat-shod" faction which consists of those who believe that the Tennessee Walker should be trained and equipped only to use the less showy gait that was characteristic of the horse when the breed was first developed. Appellants are members of the "big lick" faction. Appellants claim the Association primarily represents the "plantation" or "flat-shod" portion of the industry, and is helping that segment of the industry by filing suits against the Secretary of Agriculture.

Unfortunately, some members of the Tennessee Walking Horse industry began to engage in a practice known as "soring" to enhance the ability of the horse to perform the "big lick." Soring consists of applying an irritating substance or device to the lower part of the horse's forelegs or front feet so that when the horse walks, he suffers pain and draws his legs up high to escape the pain. *See* 15 U.S.C.A. § 1821(3) (1982). The result is the appearance of the horse performing the "big lick." The prevalence of soring increased and a public outcry began. According to appellants, the Association appeared in the midst of the outcry as an

---

: The Honorable Sam Robertson sitting by assignment.

1. The Association defines "pads" as padded shoes that change the angle of a Tennessee Walker's hoof, and cause inflammation, swelling, and an unsound gait. The pads are described in the record as pieces of material that are placed between the horse's hoof and the horseshoes. The pads are made of leather or a "plastic-like" material. "Action devices," are defined by the Association as chains or beaded rollers attached to a horse's lower forelegs that irritate the pastern thereby causing high-stepping, and perhaps, the "big lick."

organization devoted to the well-being of all horses. Appellants claim that in reality, the Association is devoted to eliminating the Tennessee Walker as a show horse, or at least, eliminating the "big lick" faction in the industry.

The Association concentrated its efforts between 1966, the year of its inception, and 1970 on lobbying Congress for federal legislation outlawing the practice of soring. Due in large measure to the efforts of the Association, Congress adopted the Federal Horse Protection Act in 1970 (the Act). *See* 15 U.S.C.A. §§ 1821–1831 (1982). The Act essentially prohibits the showing, exhibition, transport, and sale of "sore" horses. *See* 15 U.S.C.A. § 1823(a)–(b). The Act also provides for inspections and reports by the Secretary of Agriculture to Congress. *See* 15 U.S.C.A. §§ 1823(e) and 1830.

According to appellants' petition, the official United States Department of Agriculture figures showed that by 1980 ninety-eight to ninety-nine percent of all Tennessee Walkers were free from any soring at the time of show or sale. Appellants contend these figures should have satisfied the Association, and its attention should have turned to other "equine matters" that were problematic and receiving much less attention. Yet, appellants contend the Association continued in its efforts to destroy the industry.

Appellants alleged the Association continued its plan by asking the United States Department of Agriculture to ban all action devices and pads. The Association does not dispute that it was working toward a ban on these items. Even though studies cited by appellants apparently showed that soring was not a problem, the Association persisted in its claims that more regulations were needed because soring was still rampant in the Tennessee Walking Horse industry. Appellants contend the Association kept up this farce because most of its funding was dependent on donations from those who wanted to eliminate soring. If the Association admitted soring was essentially non-existent, its funding would dry up.

The Association filed suit against the Secretary of Agriculture in 1984 asking the federal district court to order the Secretary to go to rule-making and ban all action devices and padded shoes. Appellants alleged the Association took this step without waiting for the results of pending studies or comment from the public. The court granted summary judgment in favor of the Secretary, but the case was ultimately placed back in the hands of the Secretary of Agriculture so he could explain his refusal to go to rule-making or go ahead and begin rule-making. *See American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 8 (D.C.Cir.1987). Eventually, the Secretary of Agriculture was ordered by the federal district court to go to rule-making on action devices and pads. *See American Horse Protection Ass'n, Inc. v. Lyng*, 681 F.Supp. 949, 958 (D.D.C.1988).

The Secretary of Agriculture complied with the court's order, and the new rules concerning action devices limited their weight to six ounces, a weight found by studies not to cause soring. There were also new regulations governing padded shoes. Appellants claim the litigation and new regulations severely impacted the industry and their businesses because of uncertainty about what the Association might ask for and get next. Appellants contend these events taught the Association it could strike a blow to the industry simply by pursuing litigation against the Secretary of Agriculture without ever actually engaging anyone in the industry in litigation.

The Association claims to be a national, non-profit, humane organization dedicated to the welfare of *all* horses. The Association, through its employees and members, strives to influence government agencies concerning enforcement of legislation designed to promote and protect the welfare of horses, wild and domestic. Part of the Association's activities in this regard include filing litigation against governmental agencies, when necessary, to ensure proper enforcement of horse welfare and protection laws.

The Association admits that in the late 1970s, it worked for amendments to the Horse Protection Act to increase the penalties for violations and to set up formal inspection programs of Tennessee Walking Horse shows and sales. The Association

admits that in the mid–1980s, it began concentrating its attention to the wholesale elimination of pads and actions devices. The Association claims these devices simply replaced the outlawed technique of soring and were cruel and harmful to the horses.

As we noted above, the Association's efforts eventually resulted in the adoption of federal regulations by the Secretary of Agriculture governing the use of pads and action devices. In 1989, the Association once again filed suit against the Secretary of Agriculture. The Association claims the suit was filed because it believed that the regulations adopted by the Secretary of Agriculture were inadequate and failed to ensure proper enforcement. According to the Association, the suit was a routine challenge to an agency rule-making decision of the type specifically allowed by the judicial review provisions of the Administrative Procedure Act. *See* 5 U.S.C.A. § 702 (1992). The Association contends it was merely exercising its First Amendments right to petition the government to influence the Secretary of Agriculture's rule-making decisions.

The 1989 litigation, which named only the Secretary of Agriculture and not any of the appellants, essentially set forth the following complaint: the Secretary's rules with regard to pads and actions devices were inadequate to insure proper enforcement. The parties engaged in discovery and eventually, both the Association and the Secretary of Agriculture filed cross-motions for summary judgment. The Association motion was granted as to its complaint about action devices and the court entered an injunction. The case was appealed and the Court of Appeals for the District of Columbia vacated the injunction concluding that the Secretary had not abused his discretion in reaching his final rule-making decision to adopt a six-ounce regulation for action devices. *See American Horse Protection Ass'n, Inc. v. Yeutter*, 917 F.2d 594, 598–99 (D.C.Cir.1990).

In 1991, appellants filed suit against the Association alleging tortious interference with prospective business advantage, malicious prosecution, abuse of process, and prima facie tort.[2] Appellants' claims were based on the Association's 1989 suit against the Secretary of Agriculture. In their petition, appellants contended that the Association filed suit against the Secretary of Agriculture in a deliberate attempt to undermine their businesses by creating a risk or perceived risk that governmental restrictions would be imposed on certain practices in the industry. Appellants alleged the litigation against the Secretary of Agriculture did in fact discourage horse shows and sales that were central to the success of their businesses and they were damaged.

The Association denies appellants' allegations that it was organized to destroy the Tennessee Walker as a show horse, and denies that its suits against the Secretary of Agriculture have been filed for that purpose. On March 20, 1995, the Association filed a motion for summary judgment urging four grounds relevant to appellants' claims for tortious interference with business, malicious prosecution, and abuse of process. The trial court granted the motion for summary judgment and stated his reasons for granting the motion in two letters addressed to the parties. After their motion for rehearing was denied, appellants perfected this appeal.

The standard for reviewing summary judgments is well settled. Summary judgment is proper only when the movant establishes there are no genuine issues of material fact and proves he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management, Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Shannon v. Texas Gen. Indem. Co.*, 889 S.W.2d 662, 663 (Tex.App.—Houston [14th Dist.] 1994, no writ). Evidence favorable to the non-movant will be taken as true, every reasonable inference will be indulged in favor of the non-movant, and any doubts resolved in his favor. *Nixon*, 690 S.W.2d at 548–49; *Montgomery v. Kennedy*, 669 S.W.2d 309,

**2.** Though appellants initially pled a cause of action for "prima facie" tort, the Association urged in its motion for summary judgment that no such tort existed in Texas. In response to one of the grounds in the Association's motion, appellants conceded that no such cause of action existed in this state. Thus, the prima facie tort claim is not before this court and we need not decide whether it is recognized in Texas.

310–11 (Tex.1984). A summary judgment for a defendant, which disposes of the entire case, is proper only if, as a matter of law, the plaintiff could not succeed upon any theory pled. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex.1983); *Shannon,* 889 S.W.2d at 664.

When a summary judgment order does not specify the ground or grounds upon which the motion was granted, the reviewing court will affirm the judgment if any one of the theories advanced in the motions are meritorious. *State Farm Fire & Casualty Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993); *Shannon,* 889 S.W.2d at 664. In this case, the trial court did not state in its order the basis for granting the summary judgment motion; however, the trial court did state the grounds in letters to the parties. Appellants refer to these letters in their brief and argue they provide the basis for the trial court's judgment.

A letter is not the proper method for apprising the parties of the grounds for the granting of a summary judgment. *Shannon,* 889 S.W.2d at 664; *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197, 199 (Tex. App.—Texarkana 1993, writ denied) (citing *Taylor v. Taylor,* 747 S.W.2d 940, 944 (Tex. App.—Amarillo 1988, writ denied) (holding that only decretal portion of summary judgment operates as adjudication of the cause, not the reasons stated for it)). *See also Frank v. Kuhnreich,* 546 S.W.2d 844, 847 (Tex.Civ.App.—San Antonio 1977, writ ref'd n.r.e.). A letter cannot be considered on appeal as giving the reasons for the judgment. *See Shannon,* 889 S.W.2d at 664. Thus, because the summary judgment order itself does not state the grounds relied on by the trial court, we will affirm the judgment if any of the theories advanced by the Association are meritorious.

## IMMUNITY AND THE *NOERR–PENNINGTON* DOCTRINE

In their first point of error, appellants contend the trial court erred in granting summary judgment on the ground that the

Association was immune from liability. In its motion for summary judgment, the Association alleged as its first ground that it was entitled to judgment as a matter of law as to all of the claims asserted by appellants because it "had a First Amendment right to file the 1989 litigation and is absolutely immune from liability under the *Noerr–Pennington* doctrine." In their response, appellants claimed the Association was not entitled to immunity because the 1989 litigation was a "sham," and therefore, the immunity doctrine relied on by the Association is not applicable.[3] Specifically, appellants allege the entire point of their lawsuit is that the Association's 1989 litigation was not filed as a legitimate effort to influence the Department of Agriculture; rather, it was filed solely as a sham, intended to injure appellants and the rest of the "big lick" portion of the Tennessee Walking Horse Industry. In response to this allegation, appellee contends the 1989 litigation was not a sham under the objective test used by the Supreme Court for determining the existence of sham litigation, and therefore, it was entitled to summary judgment.

In support of its immunity claim, the Association relies on what is commonly referred to as the *Noerr–Pennington* doctrine, which arose out of two Supreme Court cases: *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). As this doctrine forms the foundation of the Association's immunity argument, and as there are no constitutional law cases on point in this jurisdiction, an explanation of the doctrine and its origins is appropriate here.

The doctrine has its roots in the First Amendment of the United States Constitution. The First Amendment guarantees the "right of the people ... to petition the gov-

---

**3.** In their argument, appellants argue that the Association sought summary judgment as to the tortious interference claim on the immunity theory. The Association did *not* limit its immunity theory to the tortious interference claim; rather, the Association asserted in its motion, and contends on appeal, that its immunity defense defeats each cause of action alleged by appellants.

ernment for a redress of grievances.[4] U.S. CONST. amend. I. Citizen access to the institutions of government constitutes one of the foundations upon which our form of government is premised. *Protect Our Mountain Env't, Inc. v. District Court of Jefferson County*, 677 P.2d 1361, 1364 (Colo.1984) (en banc). In a democracy such as ours, the government acts on behalf of the people, and effective representation depends upon the ability of the people to make their wishes known to government officials. *Id.* Thus, the right to petition has been characterized as one of "the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967).

While the right to petition obviously encompasses traditional political activities, the Supreme Court has determined that its sweep is much broader and includes other activities as well. In *Noerr*, a group of trucking companies and their trade association brought suit primarily against a group of railroads alleging violations of the Sherman Act. 365 U.S. at 129, 81 S.Ct. at 525; *see* 15 U.S.C. §§ 1–2 (1982). The trucking operators charged that a railroad sponsored publicity campaign to create public support for anti-trucking laws was an illegal attempt to monopolize the freight industry. *Noerr*, 365 U.S. at 129, 81 S.Ct. at 525. The railroads filed a counterclaim arguing that the truckers sought to establish a monopoly through similar political activities. *Id.* at 131, 81 S.Ct. at 526. The Supreme Court dismissed all of the claims holding that the Sherman Act did not reach political activity, and therefore, a plaintiff harmed by petitioning activity may not recover under the Sherman Act. *Id.* at 135–36, 81 S.Ct. at 528–29. The court found that to hold that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws would "substantially impair the power of government to take actions through its legislature and executive that operative to restrain

trade." *Id.* at 137, 81 S.Ct. at 529–30. In the words of the Supreme Court:

> To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose which would have no basis whatever in the legislative history of that Act. (footnote omitted) ... [S]uch a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

*Id.* at 137–38, 81 S.Ct. at 529–30. The Court's conclusion was not changed by the fact that the railroads' anticompetitive purpose produced an anti-competitive effect; the Court rejected the truckers' Sherman Act claim despite the fact that "the truckers sustained some direct injury as an incidental effect of the railroads' campaign to influence governmental action." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913–14, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982) (quoting *Noerr*, 365 U.S. at 143, 81 S.Ct. at 532–33).

In *Pennington*, the Court reaffirmed *Noerr*. In that case, a union and a number of large coal companies allegedly engaged in a scheme to drive smaller firms out of business by persuading the Secretary of Labor to establish a high minimum wage for employees of companies selling coal to the Tennessee Valley Authority (TVA), and by convincing the TVA to curtail certain purchases. *Pennington*, 381 U.S. at 660–61, 85 S.Ct. at 1588–89. Referring back to its decision in *Noerr*, the Court held that the political lobbying complained of did not violate the Sherman Act. *Id.* at 670, 85 S.Ct. at 1593.

The Supreme Court then decided what has become known as the third case in the "trilogy of *Noerr–Pennington* anti-trust cases:" *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30

---

4. The freedoms protected against federal encroachment by the First Amendment are entitled under the Fourteenth Amendment to the same protection from invasion by the States. *New York Times v. Sullivan*, 376 U.S. 254, 276–77, 84 S.Ct. 710, 723–24, 11 L.Ed.2d 686 (1964); *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

L.Ed.2d 642 (1972). *Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County,* 616 So.2d 562, 567 (Fla.Dist.Ct.App. 1993). In *California Motor,* a group of highway carriers sued another group alleging the defendants were attempting to monopolize the industry in violation of the Clayton Act, *see* 15 U.S.C. § 15 (1982), by repeatedly challenging the plaintiffs' license application before courts and regulatory agencies. 404 U.S. at 509, 92 S.Ct. at 611. Besides recognizing that the *Noerr–Pennington* doctrine was applicable to petitioning activity conducted before an administrative agency, the Supreme Court discussed at length certain dicta in *Noerr* that recognized an exception to the immunity defense first conferred by the Court in *Noerr. Id.* at 510–12, 92 S.Ct. at 611–13. In *Noerr,* the court first recognized that there might be certain instances in which the petitioning activity "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationship of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. That departure from the immunity of *Noerr–Pennington* has become known as the "sham" exception to the *Noerr–Pennington* doctrine. *City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 380, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991). Using the sham principle, the Court in *California Motor* found the allegations made by the plaintiffs were within the sham exception, reversed the dismissal by the district court, and remanded the case back for further development of evidence on the issue of sham. 404 U.S. at 515–16, 92 S.Ct. at 614–15.

Since *Noerr* and *California Motor,* the sham exception has been more fully developed by the Supreme Court. The sham exception covers those situations in which persons use the governmental *process*—as opposed to the *outcome* of the process—as an anti-competitive weapon. *Omni Outdoor,* 499 U.S. at 380, 111 S.Ct. at 1354. A "sham" situation involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all, *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500 n. 4, 108 S.Ct. 1931, 1937 n. 4, 100 L.Ed.2d 497

(1988), not one "who 'genuinely seeks to achieve his governmental result, but does so through improper means.'" *Id.* at 508 n. 10, 108 S.Ct. at 1941 n. 10 (quoting *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458, 465 n. 5 (9th Cir.1987), *vacated,* 487 U.S. 1213, 108 S.Ct. 2862, 101 L.Ed.2d 899 (1988)). Ultimately, in 1993, the Supreme Court devised a two-part definition of "sham" litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor" through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anti-competitive weapon."

*See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993) (quoting *Noerr,* 365 U.S. at 144, 81 S.Ct. 523, and *Omni Outdoor,* 499 U.S. at 380, 111 S.Ct. at 1354) (emphasis in the original) (citations omitted) (footnote omitted). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability. *Columbia Pictures,* 508 U.S. at 59–61, 113 S.Ct. at 1928 (emphasis in the original). Having reviewed the case law related to the doctrine and its exception, we must now determine their applicability to and impact on the case before us.

■ Lower federal and state courts have adopted *Noerr's* deference to the right to petition not only in antitrust cases, but in other cases involving civil liability. *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614–15 (8th Cir.1980); *see Professional Real*

*Estate Investors,* 508 U.S. at 59, 113 S.Ct. at 1927–28 (recognizing that *Noerr–Pennington* doctrine may be invoked in contexts other than anti-trust); *South Dakota v. Kansas City S. Indus., Inc.,* 880 F.2d 40, 50–53 (8th Cir.1989, *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990) (holding that *Noerr–Pennington* doctrine applies in suits other than those based on anti-trust violations); *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1342–46 (7th Cir.1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977) (applying *Noerr–Pennington* to 42 U.S.C. § 1985(1)); *Computer Assocs. Int'l, Inc. v. American Fundware, Inc.,* 831 F.Supp. 1516, 1522 (D.Colo.1993) (recognizing *Noerr–Pennington* doctrine applies in suits other than those based on anti-trust violations); *Sawmill Products, Inc. v. Town of Cicero,* 477 F.Supp. 636, 642 (N.D.Ill.1979) (applying *Noerr–Pennington* doctrine to 42 U.S.C. § 1983); *Sierra Club v. Butz,* 349 F.Supp. 934, 938–39 (N.D.Cal.1972) (applying *Noerr–Pennington* doctrine to contractual interference claim); *National Industrial Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex.1995) (recognizing applicability of *Noerr–Pennington* doctrine to conspiracy claim). The courts that have addressed whether the doctrine applies in cases other than those based on anti-trust violations recognized that while the doctrine originally arose in connection with anti-trust cases, it is fundamentally based on First Amendment principles. *Computer Assocs.,* 831 F.Supp. at 1522. Thus, the doctrine is a principal of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiff. *Id.* (citing *Azzar v. Primebank, F.S.B.,* 198 Mich.App. 512, 499 N.W.2d 793, 796 (1993), *appeal denied,* 443 Mich. 858, 505 N.W.2d 581 (1993)). Therefore, we find that the doctrine is applicable to the claims raised by appellants. The remaining issue is whether the Association established its entitlement to judgment based on the *Noerr–Pennington* doctrine.

■ The Association's claim of immunity based on the *Noerr–Pennington* doctrine is an affirmative defense. *See, e.g., North Carolina Elec. Membership Corp. v. Carolina*

*Power & Light Co.,* 666 F.2d 50, 52 (4th Cir.1981); Therefore, as the summary judgment movant, the Association had the burden to come forward with sufficient summary judgment evidence to establish the affirmative defense as a matter of law. *See Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996); *Nichols v. Smith,* 507 S.W.2d 518, 520 (Tex.1974); *Gonzalez v. City of Harlingen,* 814 S.W.2d 109, 112 (Tex.App.—Corpus Christi 1991, writ denied). Unless the Association conclusively established its affirmative defense, the non-movant appellants had no burden in response to the motion for summary judgment. *See Torres v. Western Cas. and Surety Co.,* 457 S.W.2d 50, 52 (Tex. 1970).

The 1989 litigation was filed by the Association against the Secretary of Agriculture alleging the Secretary's rules regarding pads and actions devices were inadequate. There is no dispute, and the summary judgment evidence proves as a matter of law, that the Association, by suing the Secretary of Agriculture, was engaged in petitioning activity covered by the *Noerr–Pennington* doctrine. *See Professional Real Estate Investors,* 508 U.S. at 59, 113 S.Ct. at 1927–28; *South Dakota,* 880 F.2d at 50–53; *Computer Assocs. Int'l,* 831 F.Supp. at 1522; *Sierra Club,* 349 F.Supp. at 938–39; *National Industrial Sand,* 897 S.W.2d at 774. Thus, the only remaining questions are whether the petitioning activity was a sham and which party was required to prove it.

After reviewing the case law concerning the *Noerr–Pennington* doctrine and the sham exception, we find that the sham exception is an affirmative defense to the doctrine. *See McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1560 (11th Cir.1992) (holding that burden of proof is on party alleging sham to prove it); *Hospital Bldg. Co. v. Trustees of the Rex Hosp.,* 791 F.2d 288, 292 (4th Cir. 1986) (holding that plaintiff in anti-trust suit in which defendant asserts *Noerr–Pennington* doctrine has burden of proving sham); *Gene Cope & Assocs., Inc. v. Aura Promotions, Ltd.,* 692 F.Supp. 724, 728 (E.D.Mich.1988) (same); BLACK'S LAW DICTIONARY 60 (6th ed.1990) (defining "affirmative defense" a matter asserted by a party,

which, assuming the complaint to be true, constitutes a defense to it; a response to a claim that attacks the legal right to bring an action as opposed to attacking the truth of the claim).

A defendant who seeks a summary judgment on the theory that the plaintiff's suit is without merit has the burden of establishing as a matter of law that there is no genuine issue of fact as to at least one essential element of the plaintiff's cause of action. *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936 (Tex.1972) (*citing Gibbs v. General Motors Corp.,* 450 S.W.2d 827 828 (Tex.1970)) When, however, the summary judgment evidence establishes a defendant's affirmative defense as a matter of law, the rule in *Gibbs* does not impose the burden on the defendant to negate a defensive plea raised by the plaintiff; rather, the burden is on the plaintiff, if it wishes to avoid summary judgment, to adduce evidence raising a fact issue on its defensive theory.[5] *"Moore" Burger,* 492 S.W.2d at 936–37. Thus, because the Association established its defense based on the *Noerr–Pennington* doctrine as a matter of law, appellants were required to come forward with *evidence* which would bring the matter within an exception or defense to the Association's affirmative defense. *See Ryland Group,* 924 S.W.2d at 121; *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936–37 (Tex.1972); *Delcourt v. Silverman,* 919 S.W.2d 777, 783 (Tex. App.—Houston [14th Dist.] 1996, writ denied). In other words, to avoid summary judgment in favor of the Association, appellants had the burden to adduce summary judgment evidence sufficient to raise a fact issue concerning the sham exception. *See Ryland Group,* 924 S.W.2d at 121; *Nichols,* 507 S.W.2d at 521;*"Moore" Burger,* 492 S.W.2d at 936–37; *Delcourt,* 919 S.W.2d at 783; *Gonzalez,* 814 S.W.2d at 112; *Palmer v. Enserch Corp.,* 728 S.W.2d 431, 435 (Tex. App.—Austin 1987, writ ref'd n.r.e.).

As stated by the Supreme Court, to prove that a suit is a sham within the context of the *Noerr–Pennington* doctrine, a party must first show that the lawsuit filed by the defendant was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors,* 508. U.S. at 60, 113 S.Ct. at 1928. We have reviewed the summary judgment proof submitted by appellants, and viewed in the light most favorable to appellants and indulging every reasonable inference in their favor, we find they have produced absolutely no evidence which would raise a fact issue on sham. There is no summary judgment evidence to suggest that the Association's 1989 litigation against the Secretary of Agriculture was "objectively baseless." Appellants have not provided any evidence that raises a fact issue with regard to the sham exception. In fact, the summary judgment proof suggests that, rather than trying to destroy any faction within the Tennessee Walking Horse industry, the Association is striving to eliminate the use of all artificial devices for training or show purposes. The fact that this may, to the delight of the Association, hurt the "big-lick" portion of the industry, is irrelevant. Unless petitioning activity is a sham, it is protected. *See Noerr,* 365 U.S. at 138–44, 81 S.Ct. at 530–33.

Moreover, according to the Supreme Court, "a winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *Id.* at 59–61 n. 5, 113 S.Ct. at 1928 n. 5. *But see In re Burlington Northern, Inc.,* 822 F.2d 518, 527 (5th Cir.1987) (refusing to lay down a categorical rule that successful petitioning can never be a sham), *cert. denied sub. nom., Union Pacific R.R. Co. v. Energy Transp. Sys., Inc.,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988). The federal district court found in favor of the Association in its 1989 litigation against the Secretary of Agriculture and remanded the case to the Secretary for re-

---

5. The only time the law requires the defendant to negate what is essentially a "defensive" plea is when the plaintiff alleges the discovery rule in response to the defendant's affirmative defense of statute of limitations. The reason a defendant is required to negate the discovery rule is because the discovery rule is not actually a defensive plea; rather, it is a judicially constructed test used to determine the date upon which a cause of action accrues. See *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990) (citing *Weaver v. Witt,* 561 S.W.2d 792, 794 (Tex.1977)).

newed consideration of whether action devices should be banned altogether "because allowing their use can reasonably be expected to encourage or cause the soring of horses in violation of the Horse Protection Act." *Yeutter,* 917 F.2d at 596. And though the court of appeals reversed the district court's decision stating that the Secretary's decision to permit the use of six-ounce action devices was not arbitrary or capricious, the court also stated:

> That is not to suggest that one could not locate facts in the record to support a contrary decision, as the district court's decision amply demonstrates, but such a de novo reweighing of the evidence presented to the Secretary is not proper when reviewing agency action under an arbitrary and capricious test.

*Id.* at 598 (emphasis added). Thus, even the court of appeals recognized there were facts in the record to support the district court's decision; the district court merely erred in reweighing the evidence under the applicable legal test. *See id.*

Because appellants failed to adduce any evidence raising a fact issue on the sham exception, the Association was entitled to summary judgment on its affirmative defense of immunity based on the *Noerr–Pennington* doctrine. We overrule point of error one and hold the trial court correctly granted summary judgment in favor of the Association.

Because the trial court did not state the grounds for its decision in the order granting summary judgment, we will, in the interest of judicial economy, review the other grounds raised by the movant in its motion and challenged on appeal by appellants. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996).

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

■ In their second point of error, appellants contend the trial court erred in granting summary judgment on their tortious interference with prospective business advantage claim. The Association replies that summary judgment was properly granted because it successfully negated the element of intent.

To establish tortious interference with prospective business advantage, a plaintiff must prove: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) malicious [6] and intentional action by the defendant that aborted a prospective business relationship; and (3) actual harm to the plaintiff. *Caller–Times Publishing Co. v. Triad Communications, Inc.,* 855 S.W.2d 18, 21 (Tex.App.—Corpus Christi 1993, no writ). The issue before this court is whether the affidavit submitted by the Association as summary judgment proof is sufficient to uphold summary judgment on the claim of tortious interference. Because we hold that it is not, the trial court's summary judgment in favor of the Association on the tortious interference claim was improperly granted on this basis.

The only summary judgment proof relied upon by the Association to negate appellants' claim of tortious interference is an affidavit by Robin Lohnes. Lohnes, the executive director of the Association, testified in his affidavit that the Association never had knowledge of any existing or potential business relationship between appellants and any other person. He further stated the Association never acted with intent to interfere with any existing business relationships of appellants.

Lohnes is obviously an interested witness because he is employed by the Association. *See Martin v. Cloth World of Texas, Inc.,* 692 S.W.2d 134, 135 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) (stating that most Texas cases regarding an interested witness involve a witness employed by or associated with one of the litigants). One other factor also shows Lohnes' interest. In his affidavit, Lohnes states that the Association is non-profit, humane organization, and that in its 29–year history, it has never employed more than five people. Because Lohnes serves as the director for a small organization, which does

---

6. In this type of action, "malice" is defined as the intentional doing of a wrongful act without just cause or excuse. *See Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984). It is a term of art and means the same as "intent" for our purposes. *Id.*

not operate for profit, his interests are obviously closely tied to those of the Association. *See Hayes v. E.T.S. Enters., Inc.,* 809 S.W.2d 652, 656 (Tex.App.—Amarillo 1991, writ denied) (stating that the similarity of witness' interest to those of appellee warranted considering testimony as that of an interested witness).

While the testimony of an interested witness may serve as the basis for rendition of a summary judgment, it may do so only if: (1) it is uncontroverted; (2) it is clear, positive, and direct; (3) it is otherwise credible and free from contradictions and inconsistencies; and (4) it could have been readily controverted. TEX.R. CIV. P. 166a(c). The Texas Supreme Court has defined the phrase "could have readily been controverted" to mean the testimony at issue is of a nature which can be effectively countered by opposing evidence. *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989). Lohnes' affidavit does not meet that standard. His testimony is not ground in any sound evidence that can be effectively countered by opposing evidence; rather, he simply concludes "the Association never acted with the intent to prohibit the plaintiffs from entering into any contract or business relationship." This type of evidence is merely a denial of intent.

Issues of intent and knowledge are not susceptible of being readily controverted and are generally inappropriate for summary judgment. *Bankers Commercial Life Ins. Co. v. Scott,* 631 S.W.2d 228, 231 (Tex.App.—Tyler 1982, writ ref'd n.r.e.). Summary judgment should not be granted when the issues are inherently those for a jury, as in cases involving intent. *Taylor v. Bonilla,* 801 S.W.2d 553, 557 (Tex.App.—Austin 1990, writ denied); *Futerfas v. Park Towers,* 707 S.W.2d 149, 157 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Lohnes' affidavit will not support summary judgment because the testimony cannot be readily controverted even if untrue. The determination of whether the Association intended to interfere with appellant's business relations rests upon Lohnes' credibility. Consequently, it is an issue for determination by a factfinder. *See Futerfas,* 707 S.W.2d at 157 (stating that if a summary judgment rests upon testimony of an interested witness and is of such a nature that it cannot be readily controverted if untrue, an issue relating to credibility of the witness is presented and summary judgment is improper); *see also Casso,* 776 S.W.2d at 558 (stating that if credibility of affiant or deponent is likely to be dispositive factor in resolution of case, summary judgment is improper).

We therefore hold that Lohnes' affidavit does not meet the standard set out in rule 166a(c). Accordingly we find the Association has failed to negate the element of intent as a matter of law. The trial court's summary judgment on this claim on the basis that the Association negated intent was improper. We sustain point of error two.

## MALICIOUS PROSECUTION

In their third point of error, appellants contend the trial court erred in granting summary judgment on the malicious prosecution claim. The Association claims summary judgment was correctly granted because the Appellants were neither parties to the 1989 litigation nor were they subject to any interference with their persons or property as a result of it.

There are six elements to establish the tort of malicious prosecution of a civil claim: (1) the institution or continuation of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice in the commencement of the proceeding; (4) lack of probable cause for the proceeding; (5) termination of the proceeding in plaintiff's favor; and (6) special damages. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 207 (Tex.1996). Appellant contends that Texas law does not require a malicious prosecution plaintiff to be named formally as a party to the underlying civil litigation. This is clearly not accurate, given the supreme court's requirement that the malicious prosecution plaintiff be the subject of a civil proceeding instituted or continued by the malicious prosecution defendant. *Id.*

Appellants request that we expand the tort of malicious prosecution, allowing non-parties to the underlying civil litigation to sue if the non-party is damaged in anyway by that litigation. This request goes directly

against the supreme court's mandate in *Green*. Although the *Green* litigation involved an injunction, the request by Green to expand the scope of the malicious prosecution tort is similar to the request made by appellants here. Green requested an expansion of the concept of "special injury" to include not only the specific target of an injunction, but any person who is indirectly affected by the injunction "when the party seeking the injunction is aware of the effects the injunction will have on others." *Green*, 921 S.W.2d at 210. Similarly, appellants are asking this court to allow an entity not named in a suit to sue for damages because of the possibility that the lawsuit may damage that entity. The supreme court specifically rejected Green's argument, noting its disapproval of the expansion of a special injury to "include the incidental effects of an injunction on those who were not directly targeted by the injunction." *Id.* Following the supreme court's direction, we likewise decline to expand the malicious prosecution tort to include someone who was not a party to the underlying proceeding. This holding is consistent with the purpose of the malicious prosecution tort. Fundamentally, this tort is available only to parties who were wrongly sued and seek to be made whole. *See Sweezy Constr., Inc. v. Murray*, 915 S.W.2d 527, 531 (Tex.App.—Corpus Christi 1995, orig. proceeding) (holding that claimant must prove suit was prosecuted maliciously and without probable cause and terminated in claimant's favor); *Toranto v. Wall*, 891 S.W.2d 3, 5 (Tex.App.—Texarkana 1994, no writ) (holding that claimant must show actual interference with claimant's person or property, such as an attachment, appointment of a receiver, writ of replevin, or injunction); *Oak Crest Civic Club v. Lowe*, 678 S.W.2d 93 94(Tex.App.—Houston [14th Dist.] 1984, writ dism'd) (holding that original proceeding must terminate in favor for a party to later bring a malicious prosecution action). Any expansion of the tort would result in anyone being able to sue for damage no matter how tangential their relationship to the original suit.

Because appellants were not parties to the underlying civil litigation, the trial court did not err in granting summary judgment to the Association for the malicious prosecution claim. We therefore overrule appellants' third point of error.

### ABUSE OF PROCESS

█ In their fourth point of error, appellants contend the trial court erred in granting summary judgment on the abuse of process claim.[7] In response, the Association claims that it never caused process to be issued against the appellants.

█ There are three elements to establish the tort of abuse of process: (1) the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act. *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex.App.—Houston [14th Dist.] 1994, writ denied). The critical aspect of this tort is the improper use of the process after it has been issued. *Id.*

█ Appellants contend Texas law does not require that the process be issued directly against the abuse-of-process plaintiff. Appellants also contend that if the abuse of process claim requires issuance directly against a party, then an exception should be made when the process is issued as a means to deliberately damage a non-party. Appellants are mistaken in their contentions. "[P]rocess must have been used to accomplish an end which is beyond the purview of the process and which compels a *party* to do a collateral thing which he would not otherwise be compelled to do." *Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 379 (Tex.App.—Texarkana 1989, no writ) (emphasis added). Further, in every decision examining an abuse of process claim, the plaintiff bringing the claim was the defendant in the original proceeding. *See, e.g., Detenbeck v. Koester*, 886 S.W.2d 477, 479 (Tex.

---

7. Although the cause of action is labeled "abuse of process," the actual cause of action is closer to the malicious prosecution claim than an abuse of process claim. For purposes of thoroughness we will discuss the abuse of process claim as it is presented to us.

App.—Houston [1st Dist.] 1994, no writ); *Blanton v. Morgan*, 681 S.W.2d 876, 877 (Tex.App.—El Paso 1985, writ ref'd n.r.e.). Here, appellants were not a party to the original action and were not served with process. Thus, appellants do not satisfy the first element for abuse of process.

 Moreover, to maintain an abuse of process claim, there must be a coercive use of the process. *Detenbeck*, 886 S.W.2d at 480. Compulsion means something more than requiring a defendant to answer a lawsuit. *Blanton*, 681 S.W.2d at 878. Filing a complaint is not an improper or illegal use of the process. *Rose v. First Am. Title Ins. Co.*, 907 S.W.2d 639, 644 (Tex.App.—Corpus Christi 1995, no writ). Merely issuing or procuring process, even if accompanied by malicious intent or without probable cause is not actionable. *Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). Maintaining an abuse of process cause of action requires an improper use of the process after its issuance. *Id.* The abuse of process plaintiff must show something more than the damages that are incidental to the filing of the lawsuit. *Id.* Here, appellants do not provide summary judgment evidence of any action they were forced to maintain as a result of the issuance of process in the original suit.

Additionally, an abuse of process claim requires a showing of a wrongful seizure of property or an actual interference with the person. *Blackstock v. Tatum*, 396 S.W.2d 463, 467 (Tex.Civ.App.—Houston 1965, no writ). In *Blackstock*, the plaintiff alleged that a "parade of lawsuits" caused mental damage from the "abuse of process of the courts." 396 S.W.2d at 466. According to the plaintiffs, the parade of lawsuits was an effort to force them to submit to attempts to build an island, depriving the plaintiffs from using a lake. *Id.* at 467. The filing of lawsuits allegedly reduced the value of property surrounding the lake, the plaintiffs contended. *Id.* The *Blackstock* court held that the improper purpose of the process manifests itself by the surrender of property or the payment of money "by the use of process as a threat or a club." *Id.* at 468. The mere

issuance of process, by itself, is not sufficient to establish the abuse of process tort. *Id.*

The *Blackstock* scenario is very similar to the scenario here. As in *Blackstock*, appellants contend that the Association filed suit against Yeutter not to determine rights and liabilities, but to prevent the appellants from training horses by a particular method. Appellants also assert that the Association's filing of lawsuits lowered the value of the horses. Therefore, the holding in *Blackstock* is controlling here. A claim for abuse of process requires a perversion of the process, and merely filing suit is not sufficient to maintain an abuse of process claim. *Id.* at 466. Because appellants were not a party to the original action and suffered no actual interference by the process, we find no error in the trial court's granting of summary judgement against the appellants on the abuse of process claim. We overrule point of error four.

## CONCLUSION

After reviewing the summary judgment evidence under the appropriate standard, we find appellants did not adduce any evidence sufficient to raise a fact issue on the sham exception. Therefore, because the Association proved as a matter of law that it was entitled to immunity under the *Noerr–Pennington* doctrine, the trial court correctly granted summary judgment in favor of the Association. Accordingly, we affirm the trial court's judgment.