# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-50257

United States Court of Appeals
Fifth Circuit

**FILED**

June 24, 2020

Lyle W. Cayce
Clerk

UNITED BIOLOGICS, L.L.C., doing business as United Allergy Services; ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE,

> Plaintiffs - Appellants

v.

ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.; TONYA WINDERS,

> Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:14-CV-35

Before STEWART, DENNIS, and HAYNES, Circuit Judges.

PER CURIAM:*

United Allergy Services[1] and Academy of Allergy & Asthma in Primary Care ("Academy") (collectively, "Plaintiffs") sued a number of defendants for Sherman Act and Texas antitrust violations, Texas common law tortious

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] United Biologics LLC does business as United Allergy Services, and it was formerly known as United Allergy Labs. We refer to this entity as United Allergy.

No. 19-50257

interference with existing contracts and prospective business relations, and civil conspiracy to commit those torts. The district court entered a directed verdict for the two defendants who went to trial, Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("Mothers") and Tonya Winders (collectively, "Defendants"). United Allergy and Academy now appeal; we affirm.

## I.    Background

United Allergy offers an alternative way to obtain allergy treatment. Under the traditional model, allergy sufferers seek treatment from a certified allergist who administers immunotherapy. Companies like Phadia US Inc.[2] sell equipment for allergy blood tests, which are often done in labs. United Allergy saw opportunity in the small number of allergists compared to allergy sufferers and began contracting directly with primary-care physicians for immunotherapy treatment. In exchange for a fee, United Allergy would provide technicians and assist physicians with immunotherapy equipment and supplies. To support its business, United Allergy helped form and fund Academy, a non-profit organization of physicians that "represent[s] the interests of . . . primary care physicians that provide allergy and asthma care to their patients."

Individual defendant Tonya Winders was first the market development team leader at Phadia and later the president and CEO of Mothers, a patient advocacy organization. While at Phadia, Winders identified United Allergy as a market obstacle to traditional allergy businesses. In one e-mail, a Phadia

---

[2] Phadia is a former defendant in this case that settled before trial, which will become important below. References to Phadia may also refer to its parent company, Thermo Fisher Scientific Inc.

2

employee said that he, Winders, and another employee wanted to "compile a broad strategy to wipe these [companies] off the face of the earth."

By August 2011, Winders had formulated what she called "[her] plan for leading the charge to stop this market obstacle from negatively impacting [business] further." Phadia trained its clinical sales consultants to provide information to physicians about remote allergy providers. In a regional meeting, it listed three talking points for sales consultants to use when interacting with customers: (1) patients are safer when receiving traditional allergy and asthma care, (2) board-certified allergists receive extensive training to become certified and prepared to address potential problems during treatment, and (3) the billing practices of remote allergy providers are concerning and could implicate providers if found to be illegal.

In 2011, the Department of Health and Human Services' Office of the Inspector General ("OIG") issued an advisory opinion regarding a business model similar to United Allergy's and concluded that it "could potentially generate prohibited remuneration under the anti-kickback statute."[3] U.S. Dep't of Health & Hum. Servs., Re: OIG Advisory Opinion No. 11-17, at 1 (Nov. 23, 2011). Phadia shared the opinion internally as something that would "help . . . combat these companies." It also shared the opinion with a company that was negotiating with United Allergy, the Hospital Corporation of America. In an e-mail chain, a Phadia employee said that he may have "prevented a clinic

---

[3] The opinion was requested by the owner of a company named Universal Allergy Labs—similar to United Allergy's former name, United Allergy Labs—and which is now supposedly named Universal Allergy Services—similar to United Allergy Services. The purpose was ostensibly to gather information on implementing a business model similar to United Allergy's. The requester sent the OIG a sample contract substantially the same as one of United Allergy's form contracts. After Winders became its president, Mothers hired a consultant who had been involved with the request for the OIG opinion, although they both testified that the two events were unconnected.

from signing on with [United Allergy]." Phadia also distributed publications authored by Mothers, and on one occasion, an insurance provider Phadia had contacted told non-certified physicians to cease remote allergy treatments. Mothers also campaigned against remote allergy practice, including by distributing articles, in part under Winders's direction.

Beginning in 2013, United Allergy's business declined; it lost insurance reimbursements and ultimately substantially diminished its business. Academy, for its part, lost many of its members.

United Allergy and Academy filed the instant suit in 2014, later amending their complaint to add Mothers, Winders, and Phadia as defendants, which brought the number sued to more than a dozen. They alleged violations of Section 1 of the Sherman Act[4] and Texas law: namely, section 15.05(a) of the Texas Free Enterprise and Antitrust Act,[5] common law tortious interference with existing contracts and prospective business relations, and common law civil conspiracy. At the time of trial in 2016, all defendants except the appellees, Mothers and Winders, had settled.

After trial, the Defendants moved for a directed verdict, arguing in part that civil conspiracy was a "legal impossibility" because Phadia, which allegedly committed the underlying tort, had settled. They urged that "[t]he Court [could not] adjudicate the conduct of parties who [were not] before it," "there [was] no other way for the Court to adjudicate the underlying tort at issue," and "Miss Winders [could not] conspire with her own company." The district court agreed and entered a directed verdict on the issue of civil conspiracy. The jury then unanimously found that neither Mothers nor

---

[4] 15 U.S.C. § 1.

[5] Tex. Bus. & Comm. Code Ann. § 15.05(a).

No. 19-50257

Winders individually committed tortious interference. The jury was asked a conditional question; although the condition was not met, it answered the question, finding that the "Defendants' agreement with one or more of Phadia [or other defendants] was only an attempt to persuade . . . lawmakers to take official government action," thus falling within the *Noerr–Pennington* safe harbor.[6]

The Plaintiffs then moved for judgment as a matter of law and for a new trial. The district court denied that motion, holding that any error made in the jury instructions was harmless because no co-conspirator was found to have committed the underlying tort—a prerequisite for civil conspiracy under Texas law. *United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, No. 5:14-CV-00035, 2019 WL 830967, at *2–3 (W.D. Tex. Feb. 21, 2019) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). The jury, the court reasoned, found that Mothers committed no tort and did not consider (and could not have considered) whether Phadia committed the underlying tort with Mothers' help because Plaintiffs did not request a jury instruction on that question. *United Biologics*, 2019 WL 830967, at *2. Therefore, the court held, Mothers' "liability for conspiracy was legally impossible." *Id.* United Allergy and Academy timely appealed.

## II.    Discussion

We review a district court's grant of a motion for judgment as a matter of law de novo, using the same standard as the district court: such judgment is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Flowers v. S. Reg'l*

---

[6] The *Noerr–Pennington* safe harbor doctrine arose out of two Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965).

No. 19-50257

*Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (quotation omitted); *see also* FED. R. CIV. P. 50.  Under this standard, a directed verdict should be entered only when "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Flowers*, 247 F.3d at 235 (internal quotation omitted).

## A. Texas Civil Conspiracy

In Texas, common law civil conspiracy extends liability for a tort jointly and severally "beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926–27 (Tex. 1979) (quotation omitted).  The Texas Supreme Court has enumerated five elements of civil conspiracy: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

"Unlike criminal conspiracy, civil conspiracy itself does not create liability—the conspirators must pursue an independently unlawful purpose or use an independently unlawful means before they can be held liable." *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1179 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007 (1983).  In other words, civil conspiracy is a "derivative tort," meaning "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681. The Texas Supreme Court clarified last year that "civil conspiracy is a theory of vicarious liability" and is not an independent tort.  *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

Defendants make two arguments they say forestall consideration of the Plaintiffs' arguments: (1) that Phadia's settlement precluded a finding of an

6

underlying tort for civil conspiracy, and (2) that the jury's finding on *Noerr–Pennington* acted as a defense to any civil conspiracy claim that was or could have been presented to the jury.

### 1. *Phadia's Settlement*

The Defendants argue that because Phadia—the alleged tortfeasor—settled, the Plaintiffs could not have proven the existence of an underlying tort, making their civil conspiracy claim fail as a matter of law.[7]  One Texas court of appeals has held that civil conspiracy cannot rely on the alleged torts of defendants who settled in a *prior* suit because they were never joined in the instant suit. *West Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920–21 (Tex. App.—Dallas 2014, pet. denied).  Another has held differently, concluding that (1) the plaintiff need not sue the underlying tortfeasor in the same suit as the co-conspirators but may instead do so in successive suits, and (2) co-conspirators may be held liable for civil conspiracy even though the underlying tortfeasor previously settled. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 446–48 (Tex. App.—Houston [14th Dist.], pet. filed).

But these cases do not address the situation at hand: The alleged tortfeasor, Phadia, *was* joined in the same suit as its alleged co-conspirators. Under Texas law, "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff *seeks to hold* at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681 (emphasis added).  United Allergy and Academy did this.  The alleged co-conspirator need not actually face liability. *See Agar Corp.*, 580 S.W.3d at 140–42.  Texas courts are well-versed in submitting for the jury's consideration the question of whether persons not in the case contributed to the wrongs alleged: Chapter 33

---

[7] We discuss the underlying tort claims in detail below in section II.B.

No. 19-50257

of the Texas Civil Practice and Remedies Code specifically provides that the jury "shall determine the percentage of responsibility" for claimants, defendants, settling persons,[8] and any responsible third parties. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). Clearly, a settlement in general does not prevent submitting to the jury questions about that party's conduct (only pursuing an actual judgment against the settling party).[9] Therefore, we conclude that Phadia's settlement had no bearing on the Plaintiffs' ability to prove a civil conspiracy case against the Defendants based on an underlying tort committed by Phadia.

2. *The* Noerr–Pennington *Finding*

The *Noerr–Pennington* defense protects, via the First Amendment, arguably anti-competitive conduct that involves petitioning the government rather than private entities, unless the petitioning is a sham. *See generally RRR Farms, Ltd. v. Am. Horse Prot. Ass'n*, 957 S.W.2d 121, 126–28 (Tex. App— Houston [14th Dist.] 1997, pet. denied) (explaining the history of the doctrine). The question that would support this finding should not have been answered by the jury.[10] Therefore, we do not consider it. *See White v. Grinfas*, 809 F.2d

---

[8] A "settling person" is "a person who has, at any time, paid or promised to pay money or anything of monetary value to a claimant in consideration of potential liability with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(5). Chapter 33 does not directly apply here but is cited as illustrative of how jurors are asked all the time about persons/entities not currently before them.

[9] To that same point, the Defendants failed to show (or cite any case law that would support) that Phadia's objection to having its name in the jury questions would have any weight, given that it was no longer a party due to the settlement.

[10] This was question nine (the final question) on the verdict form; above question eight was the instruction, "If you answered 'Yes' to Question 5, then answer the following questions. Otherwise, do not answer the following questions." The jury answered *no* to question five, the question whether Mothers or Winders themselves intentionally interfered with contracts or prospective business relations, but still answered question nine.

1157, 1161 (5th Cir. 1987) (ignoring questions that the jury was instructed not to answer and that necessarily conflicted with a question that it was required to answer). Therefore, this finding would not shield any civil conspiracy activity committed by the Defendants.

## B. Sufficiency of the Evidence of an Underlying Tort

Having concluded that no legal barriers prevent the Plaintiffs from proving a claim of civil conspiracy, we turn to the question whether they presented sufficient evidence of an underlying tort to survive a motion for judgment as a matter of law.[11] We conclude that they did not, for they did not present evidence that could support a finding in their favor on each element of either alleged underlying tort: (a) tortious interference with existing contracts, or (b) tortious interference with prospective business relations.

### 1. *Tortious Interference with Existing Contracts*

We first discuss whether there was evidence to conclude that Phadia committed tortious interference with existing contracts. This tort has four elements: "(1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) such act was a proximate cause of damage; and (4) actual damage or loss occurred." *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004). The intentionality requirement means that the interference must have been purposeful, not that "the defendant acted with intent to injure." *Id.*

---

[11] The Plaintiffs couch their argument in terms of whether the jury should have been instructed on the issue of civil conspiracy. However, because the district court granted the Defendants' motion for judgment as a matter of law and entered a directed verdict, the dispositive inquiry is whether a reasonable jury could have found in the appellants' favor. *See Hodge*, 933 F.3d at 473.

No. 19-50257

"Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference."  *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).  This is true even if there is "malicious intent" to produce the actions.  *See C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985).  By contrast, tortious interference exists only when the defendant (a) "knowingly induce[s] one of the contracting parties to breach its obligations," *John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied), or (b) makes "performance more burdensome or of less or no value to the one entitled to performance." *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 359–60 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

The Plaintiffs argue that "Phadia targeted clinics and physicians contracting with [United Allergy] or associated with [Academy] and coerced those physicians with unfounded concerns of fraud and malpractice liability to 'put these guys out of business.'"  But they point to no evidence that any contract was breached or that performance was impaired—only that membership and revenue declined because contracts with physicians ended in some fashion, forcing United Allergy to cease expansion.  For example, United Allergy's CEO testified that the company "negotiated" its relationship with the Texas Health Physicians Group several times to prevent the contract from ending.  Further, the nature of United Allergy's relationship with Hospital Corporation of America is unclear—if they had a contract, there is no evidence that it was breached or impaired.  Even though United Allergy's CEO testified that contracts with physicians ended or terminated, there was no evidence that their cessation was not proper according to their terms and the causation evidence is ethereal at best.  There was no evidence, either, that the physicians and groups were not acting within their rights when they reduced their

10

business with United Allergy in favor of traditional providers. Although the evidence shows that Phadia wished for the Plaintiffs' business to decline, and perhaps played a part in producing that decline, there is no evidence that any interference was *tortious*; competition alone is not tortious interference. Therefore, the Plaintiffs proffered insufficient evidence to support a claim of civil conspiracy based on tortious interference with existing contracts.

2. *Tortious Interference with Prospective Business Relations*

As the Defendants correctly identify, most of the Plaintiffs' claims instead depend on interference with *prospective* business relations, a different tort that is also even more difficult to prove than tortious interference with contract. It requires the following:

> (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.

*Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The key distinguishing element is the second one: that the defendant must commit an independently tortious or unlawful act, not merely act with malice or other ill will. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). The Texas Supreme Court recently clarified that "interference with prospective business relations has never been thought to be wrongful in and of itself." *Id.* at 717. Therefore, a defendant must do something independently unlawful or tortious ("actionable under a recognized tort"). *See id.* at 726.

United Allergy and Academy have not identified what tort or illegal act Phadia or another defendant is supposed to have committed. To be sure, Phadia used various means to increase its market share in the face of competition, but by all accounts, the means were legitimate, even if they were arguably "'sharp' or unfair." *See id.* The Plaintiffs claim that Phadia's statements about fraud and malpractice were "unfounded," but they offer no evidence in support. Evidence to the contrary includes the OIG opinion and testimony that more than one insurance company independently began investigating remote allergy billing practices. Phadia did circulate the OIG opinion, but this was not tortious or wrongful; and it did not falsely represent that the opinion referred specifically to United Allergy, but rather truthfully said that it referred to a similar business model. Even if Phadia's conduct was expressly designed to put United Allergy out of business, it was not independently tortious or unlawful and cannot support a claim of tortious interference with prospective business relations. Therefore, the Plaintiffs put forth insufficient evidence to support a claim of civil conspiracy based on tortious interference with prospective business relations.

### III.   Conclusion

Although we find no legal obstacle to the Plaintiffs' claims, we conclude that the Defendants were entitled to judgment as a matter of law on civil conspiracy. Therefore, we AFFIRM.