**Affirmed in part; Vacated and Dismissed in part; Opinion Filed December 17, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00403-CV

**PROFINITY, LLC, Appellant**
**V.**
**ONE TECHNOLOGIES, L.P., Appellee/Cross-Appellant**
**V.**
**Chad D. Ertel, Cross-Appellee**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-03980-A**

## MEMORANDUM OPINION

Before Justices Lang, Lang-Miers, and Fillmore
Opinion by Justice Lang

Appellee/cross-appellant One Technologies, L.P. ("OT") filed this lawsuit against appellant Profinity, LLC ("Profinity") and cross-appellee Chad D. Ertel, a Profinity employee formerly employed by OT. OT's claims (1) were based on Ertel's alleged violation of a non-compete agreement between Ertel and OT and (2) included, in part, a claim for breach of contract against Ertel. Profinity asserted a counterclaim against OT based on section 15.05 of the Texas Free Enterprise and Antitrust Act ("TFEAA").[1] The jury (1) found against OT on its

---

[1] *See* TEX. BUS. & COM. CODE ANN. § 15.05 (West 2011).

claims and in favor of Profinity on its antitrust counterclaim and (2) awarded Profinity damages in the amount of approximately $3.6 million. OT filed a motion for judgment notwithstanding the verdict ("JNOV") as to Profinity's counterclaim and OT's breach of contract claim against Ertel. The trial court granted OT's motion for JNOV as to Profinity's counterclaim, otherwise denied the motion for JNOV, and ordered that "each party take nothing." Both Profinity and OT appeal the trial court's ruling.

In its sole issue on appeal, Profinity contends the trial court erred by "rendering a take-nothing judgment on Profinity's anticompetitive claim." In a cross-issue, OT asserts it is entitled to judgment as a matter of law on its breach of contract claim against Ertel. We decide against Profinity on its issue and against OT on its cross-issue. Further, we conclude the trial court lacked jurisdiction as to Profinity's counterclaim. We (1) vacate the portion of the trial court's judgment granting OT's motion for JNOV as to Profinity's counterclaim, (2) render judgment dismissing that counterclaim for lack of jurisdiction, and (3) otherwise affirm the trial court's judgment. Because the law to be applied in this case is well settled, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a), 47.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute that (1) the business operations of both OT and Profinity include, at least in part, marketing competing credit monitoring products on the Internet; (2) Ertel was employed by OT from June 2009 until approximately November 2011, during which time his work pertained primarily to marketing OT's credit monitoring products; and (3) Ertel became employed by Profinity upon ending his employment with OT. Additionally, the record shows (1) OT's headquarters are located in Texas; (2) Profinity maintains headquarters in Florida, but is "mostly virtual" and has employees working from locations across the country; and (3) Ertel lived and worked in Texas at all times relevant to this case.

As a condition of his employment with OT, Ertel signed an "Employment Agreement" (the "agreement") dated June 16, 2009. The agreement provided in part that for one year after termination of his employment with OT, Ertel "will not, directly or indirectly," do any of the following: (1) "engage in Restricted Business within the Restricted Territory"[2]; (2) "give advice or lend credit, money or Employee's reputation to any natural person or entity engaged in or establishing the Restricted Business in the Restricted Territory"; or (3) "influence or attempt to influence any customer, potential customer, supplier or accounts of [OT] to stop doing business with [OT] or to do business with a competing company."

In approximately October 2011, Ertel accepted an offer of employment from Profinity. After accepting that offer, but prior to leaving OT, Ertel signed an October 18, 2011 addendum to the agreement (the "addendum"). Paragraph six of the addendum stated, in part,

> Employee and [OT] acknowledge that Profinity, as part of its business operation, engages in Restricted Business within the Restricted Territory. However, Employee represents and warrants that Employee will not engage in Restricted Business within the Restricted Territory for Profinity or any other entity or person in violation of the Agreement. Although Employee will give advice and lend Employee's reputation to Profinity, Employee represents and warrants that he will not give advice or lend his reputation to Profinity (or any other person or entity) related in any way to Profinity's engagement in Restricted Business within the Restricted Territory. . . . Without limiting in any way the Parties' agreement that the terms of the Agreement remain in effect unless explicitly modified by the terms of the Addendum, Employee acknowledges and agrees that nothing in this Addendum modifies Employee's obligations under the Agreement.[3]

---

[2] As to "Restricted Business," the agreement stated in part as follows:

> "Restricted Business" means (i) any businesses conducted by [OT] or its subsidiaries during the term of Employee's employment, and which relate to or concern (directly or indirectly) any Confidential Information provided to Employee and/or which relate to or concern (directly or indirectly) Employee's duties or assignments for [OT], and/or (ii) any business competitive with the businesses conducted by [OT] or its subsidiaries, during the term of Employee's employment, and which relate to or concern (directly or indirectly) any Confidential Information provided to Employee or which relate to or concern (directly or indirectly) Employee's duties or assignments for [OT]. "Restricted Business" includes but is not limited to pay-per-click advertising and affiliate marketing specific to those businesses.

Further, (1)"Confidential Information" was defined in the agreement as "information that is not generally known by or available to the public about or belonging to [OT], that belongs to other companies or businesses to which [OT] may have an obligation to maintain information in confidence, or that is a trade secret and/or intellectual property belonging to [OT]" and (2) "Restricted Territory" was defined to include "the entire United States and any foreign country in which [OT], its affiliates or subsidiaries conduct any business or in which businesses competitive with the businesses of [OT] are conducted."

[3] Additionally, paragraph five of the addendum stated,

OT filed this lawsuit against Ertel and Profinity on April 10, 2012. In its live petition at the time of trial, OT contended in part that during his employment with Profinity, Ertel disclosed OT's confidential information to Profinity, solicited OT's clients, "promoted and sold Profinity's competing credit monitoring product," and "otherwise directly competed with [OT]." Additionally, OT alleged Profinity was aware of Ertel's contractual obligations to OT, but "[n]onetheless . . . hired Ertel to participate in marketing its credit monitoring products through and to [OT's] current and potential customers, clients, and suppliers and, furthermore, used [OT's] confidential information . . . to gain a competitive advantage in the marketplace." OT asserted, in part, (1) a breach of contract claim against Ertel and (2) claims against Profinity and Ertel for breach of fiduciary duty, misappropriation of trade secrets, and tortious interference with a contract. Additionally, OT requested injunctive relief "to halt the unlawful conduct of Profinity and Ertel."

Following a hearing on OT's request for injunctive relief, the trial court signed an April 27, 2012 "Agreed Order of Temporary Injunction" that, in part, (1) enjoined Ertel from "directly or indirectly . . . work[ing] for, provid[ing] services for, or support[ing] in any way" the marketing or selling of credit-related products and services; soliciting any person or entity to market or sell credit-related products and services; and working with the individual responsible for Profinity's credit monitoring product; and (2) enjoined Profinity from using Ertel to engage in any business that competes with OT in the credit monitoring business.[4]

---

Employee and [OT] each respectively acknowledge that no inducements, promises, or agreements, oral or otherwise, regarding the subject matter of this Addendum, have been made by either party to the other, or by anyone acting with the authority of either party, that are not explicitly stated in this Addendum. Employee and [OT] agree that all terms of the Agreement remain in effect unless explicitly modified by the terms of this Addendum. . . . Employee and [OT] agree that this Addendum constitutes part of the Agreement and may be amended only in a written document signed by Employee and [OT].

[4] The injunction remained in effect until May 10, 2013.

–4–

Ertel and Profinity filed separate general denial answers to OT's petition and asserted affirmative defenses that included estoppel and waiver. Additionally, on April 1, 2013, Profinity asserted the antitrust counterclaim described above. Profinity alleged in part in its counterclaim that between October 4, 2011, and October 18, 2011, multiple conversations took place between Ertel and OT's general counsel, Fred Loeber, respecting Ertel's departure and his obligations under the agreement. Further, according to Profinity, (1) in those conversations, "Loeber clarified that [OT] would object only to Ertel's employment with Profinity to the extent Ertel's job duties and responsibilities included marketing Profinity's credit monitoring product to [OT's] affiliates"; (2) "[w]ith that specific understanding, as Loeber explained it to Ertel, Ertel signed the Addendum"; (3) "[u]nder [OT's] current interpretation of Ertel's obligations, however, virtually anything that Ertel did or could possibly have done while employed by Profinity would constitute a violation of Ertel's non-compete"; and (4) "[OT] intended, from the very beginning, to coax Ertel into a sense of security and to trap Profinity in alleged violations of the non-compete agreement . . . in an effort to hinder Profinity as a competitor of [OT] and, ultimately, to put Profinity out of business." Based on those allegations, Profinity contended OT "engaged in predatory and anticompetitive conduct with a specific intent to monopolize and a dangerous probability of achieving monopoly power" in violation of section 15.05(b) of the TFEAA.

OT filed an answer to Profinity's counterclaim that included a general denial and raised certain "defenses." One "defense" asserted by OT claimed that Profinity's counterclaim is "barred by the *Noerr–Pennington* doctrine," which, according to OT, "shields from liability those who resort to litigation that may also hinder competition."

On October 22, 2013, OT filed a "supplement" to a motion it had filed several weeks earlier to exclude the testimony of Profinity's damages expert, Barry Bell, at trial. In that "supplement," OT asserted Bell's testimony should be excluded because Bell's calculation "fails

–5–

to consider the limitations placed on damages under the [TFEAA], which limits damages to those associated with harm occurring in Texas."[5] Profinity objected to the "supplement" on the grounds that it constituted an "amended motion" that "was neither timely filed nor properly asserted." The "supplement" to OT's motion was denied by the trial court.

Trial commenced November 12, 2013. The documents introduced into evidence at trial included, in part, (1) signed copies of the agreement and the addendum and (2) numerous documents pertaining to communications between Ertel and various business associates.

Loeber testified in part that, prior to Ertel's departure from OT, he and Ertel (1) exchanged emails respecting the meaning of the addendum and (2) "agreed that [Ertel] would not market a credit monitoring product." However, Loeber stated, he did not "agree by way of the addendum" or otherwise that Ertel was prohibited only from marketing Profinity's credit monitoring product to OT's affiliates or disclosing confidential information.

Further, Jamie Schultz, OT's chief strategy officer, testified in part as follows:

Q. With respect to the addendum and Mr. Ertel's employment obligations after he left [OT], what is your understanding of what he was supposed to not do when he went to Profinity?

A. My understanding is that he was supposed to not market credit monitoring to [OT's] affiliates and not divulge any confidential information and not use any confidential information.
. . . .
Q. . . . With respect to his obligations in the credit monitoring industry, was the only thing that he could not do was not market or was it broader than that?

A. I think he was generally not allowed to compete with us in the credit monitoring industry.

Blaine LaBron testified he became senior manager of affiliate marketing at OT after Ertel left that company. LaBron stated that in early February 2012, he received an email intended for Ertel that was inadvertently sent by a Profinity affiliate to Ertel's former OT email account.

---

[5] In support of that argument, OT cited *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671 (Tex. 2006).

Specifically, the record shows (1) that email was part of an exchange between the affiliate and Paul Quintal, Profinity's executive vice president, respecting a credit monitoring product; (2) Ertel was listed as a "cc" recipient; and (3) the email conversation included the following statement by Quintal to the affiliate: "I will send over the tracking links and creative assets, etc [sic] later today. (Chad needs to issue them and he is in the air)." According to LaBron, because the email contained a reference to Ertel issuing a "tracking link" for a Profinity credit monitoring product, it appeared to him that Ertel was "involved in credit monitoring" at Profinity. LaBron testified (1) he reported the email to his superior at OT and (2) "it was this email that lead ultimately to this entire lawsuit being filed by [OT]."

As to damages respecting its claims, OT presented expert testimony of Ernest Janik. Janik testified he used both a "low model" and a "high model" to calculate damages to OT. According to Janik's calculations, OT's "lost net profits" totaled $9.5 million using the low model and $11.2 million using the high model. Additionally, Janik testified those numbers constituted "complete damages" for "the total harm, the complete harm" resulting from all causes of action alleged by OT and "are not connected to any specific claim." On cross-examination, Janik was asked, "[I]f Mr. Ertel violated his noncompete obligation, how much money does he owe your client?" Janik answered, "I haven't calculated that."

Ertel testified at trial that after submitting his letter of resignation to OT in early October 2011, he had a conversation with Loeber in which Loeber told him OT was going to "create a document that would allow [Ertel] to go to Profinity." At that time, Ertel told Loeber that at Profinity he would be (1) "responsible for almost all aspects of the prepaid [debit card] program" and (2) involved in marketing campaigns for products other than credit monitoring and "some operational roles." A few days later, Ertel received an email from Loeber containing the addendum. Ertel stated he did not seek legal counsel respecting the addendum.

Ertel testified he was "concerned" when he read the portion of the addendum that stated he "acknowledges and agrees that nothing in this addendum modifies employee's obligations under [the] agreement" because, according to Ertel, "if nothing modified my employee agreement, I wouldn't be able to come to Profinity." He sent an October 13, 2011 email to Loeber that stated as follows: "Basically, the agreement is saying that OT knows about the restricted business which doesn't mean there is a waiver or other binding agreement and that all terms of the existing employee agreement (IP/Non-compete) is still in place? Am I understanding that right?" Loeber responded by email, "That is correct."

Further, Ertel stated that on October 18, 2011, prior to signing the addendum, he met with Loeber "[t]o clarify the meaning of the addendum." Ertel testified (1) "I asked Mr. Loeber several questions about the addendum and, in comparison, some scenarios that I thought may play into the actual addendum and the meaning" and (2) "it was clear to me that Mr. Loeber had stated that as long as I wasn't marketing credit monitoring to [OT's] affiliates or disclosing confidential information that I would be not in violation of my addendum and my non-compete." Ertel stated that after that conversation, he signed the addendum in Loeber's office. Then, Ertel called Profinity's president, Mark Beacham, and "explained to [Beacham] the agreement that we had reached, the understanding of the actual agreement."

Ertel testified that prior to leaving OT, he had another opportunity to speak in person with Loeber about his post-employment obligations to OT. Specifically, Ertel stated as follows:

A. . . . I wanted to reiterate my understanding of our discussion from the other day, and that was to ask Mr. Loeber if—my understanding was that as long as I wasn't marketing credit monitoring to [OT's] affiliates and disclosing confidential information, I would not be in violation of my agreement.

Q. And what did Mr. Loeber say in response?

A. He agreed with me.

Additionally, Ertel testified that while working at Profinity, he did not "market" credit monitoring products to OT's affiliates. He stated he marketed products other than credit monitoring, including Profinity's prepaid debit card product, to OT affiliates and others. Additionally, Ertel testified he issued "tracking links" for all of Profinity's products and "marketing channels."[6]

The trial proceeded with Profinity's presentation of Bell's testimony respecting damages. As to OT's claimed damages, Bell testified in part (1) the financial records provided by OT do not show harm to OT and (2) Janik's damage calculations are "grossly inflated due to illogical and highly speculative assumptions" and include revenues from sources that should not have been considered.

Further, as to Profinity's claimed damages, Bell stated in part on direct examination:

Q. And so in order to calculate or to quantify the harm to Profinity that was caused by [OT], the alleged anticompetitive acts, what did you do?

A. I looked at the lost subscribers. That's really what's at issue here. It's not just looking at revenue numbers. It's understanding where those revenue numbers come from. And the way these companies make money is that individuals go online or through other means and purchase credit monitoring. . . . And so really the revenue derives from signing up new subscribers.

According to Bell, the "total lost profits" suffered by Profinity as a result of OT's alleged anticompetitive conduct was $1,784,000.

---

[6] Ertel's testimony respecting tracking links included the following:

Q. What is a tracking link?

A. It—best way to probably explain it is a tracking link is the way in which you record visitor information and sales to a particular marketing campaign.

Q. Is that—is the insertion or providing a tracking link to an affiliate after they've signed a contract with Profinity, is that a marketing function, an administrative function, an operations function or something else?

A. Definitely administrative.
. . . .
Q. At any time, did your involvement in providing tracking links across all of Profinity's products and channels involve you marketing credit monitoring to [OT's] affiliates?

A. Absolutely not.

On cross-examination, Bell testified, in part,

Q. And that's to Profinity's business of credit monitoring, correct?

A. Yes, I would agree to that.

Q. That's a nationwide business that it conducts, correct?

A. Yes.
. . . .
Q. . . . [H]ave you segregated out any of that $1.8 million to damages that occurred only in Texas?

A. As I understand your question, I—no.

Q. You haven't done a state-by-state analysis; is that correct?

A. That is correct.
. . . .
Q. . . . And the way that you've calculated that $1.8 million in damages is based upon the 75,908 lost subscribers, correct?

 A. Yes.

Q. How many of those subscribers were lost to Profinity in the state of Texas?

A. I didn't do that analysis. I don't know.

On re-direct examination, Bell was asked, in part, "Could you ever geographically locate the subscribers who did not sign up for Profinity's product?" Bell answered, "No." Additionally, Bell testified that the "conduct" he was "attempting to quantify in terms of damage" occurred in Texas.

Following the presentation of evidence,[7] OT moved for a directed verdict on Profinity's counterclaim on several grounds, including that "there was no evidence of injury occurring in Texas." Counsel for Profinity responded, in part, (1) "[o]n redirect, we had identified that all the conduct, all the conduct occurred here and harmed Profinity here, because that's where Mr. Ertel

---

[7] The record shows numerous other witnesses testified at trial, including additional employees of OT and employees of several OT affiliates. Because that testimony is not relevant to this appeal, we do not describe that testimony in detail.

worked and that's where it all took place" and (2) "[i]t is not the hypothetical consumers, Your Honor, that would have signed up for which there was harm," but rather "[t]he harm is to the competitor." The trial court stated it would reserve its ruling on that issue.

During closing argument, counsel for OT argued in part (1) "in Paragraph 5 of the Employment Agreement Mr. Ertel represented and warranted, he said that it was true that there were no other agreements, oral or in writing"; (2) "[h]is agreement's very simple, he won't compete for a period of a year and he won't engage in the restricted business for that time period"; and (3) "[OT] only does credit monitoring, so you could go to somebody else and do anything you wanted to do as long as you stayed out of the restricted business, credit monitoring." Counsel for Ertel argued in part (1) Ertel and OT agreed that as long as Ertel was not "marketing credit monitoring to [OT's] affiliates or disclosing confidential information," he would not be in violation of the addendum and agreement, and (2) OT now complains as to "bits and pieces of Mr. Ertel marketing other products . . . and marketing, if they want to call it marketing, with tracking links and otherwise to non-[OT] affiliates."

At the charge conference, OT requested, in part, that the jury be instructed that "[a]n award of damages for a claim under the Texas Free Enterprise and Antitrust Act is limited to the injury occurring inside Texas." That request was denied by the trial court. Profinity requested, in part, the following definition: "'Employment Agreement' means the One Technologies, L.P. Employment Agreement, dated June 16, 2009, between One Technologies and Ertel, as amended by that certain Addendum to One Technologies, L.P. Employment Agreement, dated October 18, 2011." The trial court included that definition in the charge of the court.

Question number one of the charge of the court stated, "Do you find from a preponderance of the evidence that Defendant Chad Ertel breached his Employment Agreement with Plaintiff [OT]?" Question number two, which stated that it was to be answered only if

question number one was answered "yes," asked whether Ertel's breach was excused. Question number three, which was conditioned on having answered "yes" to question number one and "no" to question number two, addressed damages to OT resulting from a breach of contract by Ertel.

Questions number twenty-one through twenty-three pertained to Profinity's antitrust counterclaim. Those questions inquired, respectively, (1) "Do you find by a preponderance of evidence that [OT] attempted to monopolize any part of trade or commerce in connection with Defendant Chad Ertel's departure from its [OT's] employ?"[8]; (2) "What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Profinity for its damages, if any, sustained as a result of [OT's] monopolistic conduct?"[9]; and (3) "Do you find from a preponderance of the evidence that [OT's] conduct was willful or flagrant?"

---

[8] Additionally, question number twenty-one stated in part,

> To prevail on its claim of attempted monopolization, Profinity must prove each of the following elements by a preponderance of the evidence:
> 1. [OT] engaged in anticompetitive conduct;
> 2. [OT] had a specific intent to achieve monopoly power in a relevant market;
> 3. There was a dangerous probability that [OT] would achieve monopoly power in the relevant market; and
> 4. Profinity was injured in its credit monitoring business by [OT's] anticompetitive conduct.

[9] Additionally, question number twenty-two stated,

> Antitrust Damages
> In order to recover damages from [OT's] conduct, Profinity must show the following:
> 1. Profinity was in fact injured as a result of [OT's] violation of the antitrust laws;
> 2. [OT's] alleged illegal conduct was a material cause of Profinity's injury; and
> 3. Profinity's injury is an injury of the type that the antitrust laws were intended to prevent.
>
> Profinity must prove that it was injured as a result of [OT's] alleged violation of the antitrust laws. Proving the fact of damage does not require Profinity to prove the dollar value of its injury. It requires only that Profinity prove that it was in fact injured by [OT's] alleged antitrust violation.
>
> Profinity must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that [OT's] alleged illegal conduct was a material cause of Profinity's injury. This means that Profinity must have proved that some damage occurred to it as a result of [OT's] alleged antitrust violation, and not some other cause. Profinity is not required to prove that [OT's] alleged antitrust violation was the sole cause of its injury; nor is Profinity required to eliminate all other possible causes of injury. It is enough if Profinity has proved that the alleged antitrust violation was a material cause of its injury.
>
> Finally, Profinity must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Profinity's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Profinity's injuries are antitrust injuries. On the other hand, if Profinity's injuries were caused by heightened competition,

The jury answered "no" to question number one and, accordingly, did not reach questions two and three. Further, the jury answered "yes" to questions twenty-one and twenty-three and found lost profits to Profinity in the amount of $3,641,828.

OT filed separate motions for JNOV on its breach of contract claim and Profinity's counterclaim. As to its breach of contract claim, OT contended in part that it was entitled to judgment on that claim because "the evidence presented at trial conclusively established that Ertel breached the Employment Agreement and Addendum, as a matter of law." Specifically, according to OT, "[a]t trial, Profinity and Ertel did not dispute—to the contrary, their own witnesses and evidence established—that Ertel 'engage[d] in' credit monitoring and 'g[a]ve advice or len[t] [his] reputation to Profinity' in relation to its credit-monitoring products in violation of the Employment Agreement and Addendum." As to Profinity's counterclaim, OT asserted in part (1) "Profinity sought and caused the jury to award extraterritorial damages based on injuries sustained out of Texas on its TFEAA claim" and (2) "[t]he First Amendment and the *Noerr–Pennington* doctrine shield [OT's] pursuit of its legal claims against Ertel and Profinity from antitrust liability."

In response to OT's motion for JNOV on the antitrust counterclaim, Profinity argued, in part, (1) "where the harmful conduct occurs in Texas, the TFEAA will apply—even if the trade or commerce affected by the conduct in Texas extends outside Texas"; (2) "[t]he harm to Profinity that the jury awarded as damages was based solely on [OT's] predatory conduct in Texas"; (3) OT erroneously "conflate[s] the residence of the hypothetical lost subscribers in the marketplace—the loss of revenues from which Profinity suffered harm—with the location of the harmful conduct"; and (4) the *Noerr–Pennington* doctrine is inapplicable because Profinity's

---

the competitive process itself, or by acts that would benefit consumers, then Profinity's injuries are not antitrust injuries and Profinity may not recover damages for those injuries under the antitrust laws.

Elements of Damages
    In answering this question consider only the amount of Profinity's lost profits, if any.

–13–

claim is "not based on [OT's] lawsuit but on [OT's] predatory scheme that it put in play the moment Mr. Ertel announced his departure."

Ertel asserted in part in his response to OT's motion for JNOV that OT's witnesses "conceded" at trial that he was permitted to work at Profinity if he did not market Profinity's credit monitoring product to OT's affiliates or use OT's confidential information and therefore the jury "was permitted to rely on that testimony" and "was entitled to determine whether or not Mr. Ertel breached his Employment Agreement . . . based on the parties' mutual interpretation of the agreement—at least as [OT] represented that agreement to Mr. Ertel before trial." Additionally, Ertel argued (1) OT did not establish breach of contract as a matter of law because Ertel's alleged conduct was disputed at trial; (2) OT is not entitled to JNOV because OT cannot establish as a matter of law that Ertel cannot succeed on his affirmative defenses; and (3) OT's motion for JNOV fails to address damages, which were disputed at trial.

OT filed a reply in support of each of its two motions for JNOV. In its reply respecting its breach of contract claim, OT asserted in part that Ertel "cannot, and does not, dispute [OT's] straightforward interpretation of the plain text of the contract," but rather "contends that this interpretation is foreclosed by various statements by [OT] witnesses." In a footnote to that assertion, OT cited the parol evidence rule for the first time.

During the hearing on OT's motions for JNOV,[10] counsel for Profinity restated the arguments described above and, in addition, "concede[d]" that "there is no explicit testimony . . . that [Profinity] lost a consumer in Texas." Further, counsel for Profinity argued in part,

> We have that in the evidence that there were 75,000 lost customers nationwide. . . . . [F]rom that the jury can infer that there were one or more lost customers in Texas. The odds that there would be 75,000 lost customers nationwide and not a single one in Texas are so minute that it would be a perfectly

---

[10] Although a combined hearing was held on both motions for JNOV, the record does not show the motion for JNOV respecting OT's breach of contract claim was specifically addressed during that hearing.

reasonable inference by the jury that not only was competition nationwide in Tex—harm, but necessarily that included competition in Texas. . . . Texas is, I don't know, eight [sic] of the United States population.

So I don't think it is at all a fatal defect that no one told the jury the obvious, which is, "I've looked and there's one or more of those 75,000 in Texas." . . . And the distinction from the *Harmar* case is that unlike the *Harmar* case the injury in those other states was not independent of injury in Texas.

Counsel for OT responded in part, "We can't guess or speculate that any of these 75,000 hypothetical consumers would have come from Texas."

The trial court's order described above is dated March 21, 2014. This appeal timely followed.

## II. MOTION FOR JNOV

### A. Standard of Review

A trial court should grant a motion for JNOV when (1) the evidence is conclusive and one party is entitled to judgment as a matter of law or (2) a legal principle precludes recovery. *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 645 (Tex. App.—Dallas 2015, no pet.); *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 402 S.W.3d 257, 261 (Tex. App.—Dallas 2013, pet. denied); *see also* TEX. R. CIV. P. 301. We review challenges to a trial court's ruling on a motion for JNOV under the same legal sufficiency test applied to appellate no-evidence challenges. *Basic Capital,* 402 S.W.3d at 261 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822–23, 827 (Tex. 2005)). The test for legal sufficiency must always be "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id*. We view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id*. at 261–62. Further, "[w]hen a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party had the burden of proof, it must show that the evidence establishes as a matter of law all vital facts in

–15–

support of the issue." *See, e.g., PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 710 (Tex. App.—Dallas 2011, pet. denied).

### B. Analysis

#### 1. OT's Breach of Contract Claim

##### a. Applicable Law

A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach. *See, e.g., Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769 (Tex. App.—Dallas 2005, pet. denied).

##### b. Application of Law to Facts

OT contends in its cross-issue that it is "entitled to judgment as a matter of law on its breach of contract claim" because "the plain language of the agreement prohibits Ertel from engaging in any activity in support of Profinity's credit monitoring product" and "[i]t is undisputed . . . that Ertel worked on Profinity's credit-monitoring product while subject to a non-compete agreement with [OT]." According to OT,

> [Ertel] simply points to the fact that [OT] made certain oral statements indicating that the non-compete prevents him from "marketing" to [OT's] affiliates. Based on such statements, Ertel claims that the non-compete provision only bars marketing, and not other business functions.
> But that completely misconstrues the statements—not to mention the agreement. . . . Moreover, parol evidence is not relevant where, as here, a contract is facially unambiguous and complete.

Ertel responds in part (1) "[OT] did not establish a breach of contract as a matter of law because Ertel's alleged conduct was disputed at trial"; (2) "[OT's] own testimony established its representations as to what constituted 'Restricted Business' under the Employment Agreement and Addendum"—i.e. "marketing" Profinity's credit-monitoring product to OT's affiliates—and

"[t]he jury was permitted to rely on the testimony presented . . . and to then decide Ertel did not engage in Restricted Business as the parties described it" and (3) "[b]ecause [OT] has not shown—or even argued—that the evidence conclusively negates Ertel's affirmative defenses and conclusively establishes [OT's] damages, [OT's] cross-appeal fails."

OT filed a reply brief in this Court in which it contends in a footnote (1) "[t]he merger clause precludes Ertel's affirmative defenses as a matter of law" and (2) "[w]ith respect to damages, [OT] introduced un-rebutted expert testimony."

Even assuming without deciding that the evidence conclusively shows Ertel breached the "Employment Agreement," we cannot agree with OT's position that it is entitled to judgment as a matter of law on its breach of contract claim. As described above, OT's motion for JNOV requested that the trial court render judgment for OT on its breach of contract claim generally and was not limited to the issue of liability. One of the elements a party is required to prove in order to prevail on a breach of contract claim is damages sustained as a result of the breach. *Case Corp.*, 184 S.W.3d at 769. OT did not mention or address damages in its motion for JNOV or its reply in the trial court respecting that motion. In this Court, the entirety of OT's argument respecting its damages is a single sentence in a footnote in its reply brief in which it states it "introduced un-rebutted expert testimony" on damages. However, as described above, the record shows the testimony of OT's expert was controverted by Bell. Further, OT cites no authority, and we have found none, to support the position that such "un-rebutted" testimony constitutes "conclusive" evidence. Because OT did not conclusively prove the damage element of its breach of contract claim, JNOV on that claim was not proper regardless of whether the other breach of contract elements were conclusively proven. *See PopCap Games, Inc.*, 350 S.W.3d at 710 (party challenging legal sufficiency of evidence supporting adverse finding on issue on which it had burden of proof must show evidence establishes as matter of law all vital facts in support of

–17–

issue). Thus, any error as to the jury's finding in question number one of the jury charge respecting Ertel's "breach" of the Employment Agreement is immaterial to this Court's review of whether OT's motion for JNOV on its breach of contract claim was properly denied. *Cf. Kraus v. Spencer*, 620 S.W.2d 640, 642 (Tex. App.—Dallas 1981, writ ref'd n.r.e.) (trial court did not err by denying motion for JNOV in breach of contract case, even though all testimony supporting jury's interpretation of contract violated parol evidence rule, where claimant did not prove damages upon which trial judge could have rendered judgment for claimant). On this record, we conclude the trial court did not err by denying OT's motion for JNOV as to its breach of contract claim.[11]

We decide against OT on its cross-issue.

### 2. Profinity's Antitrust Counterclaim

Profinity contends in its issue that "[b]ecause the proof at trial and the jury's verdict comport with the TFEAA and the controlling law in Texas, the trial court erred in granting [OT's] motion for judgment notwithstanding the verdict." OT responds that the trial court correctly rendered judgment as a matter of law for OT on Profinity's counterclaim for "three independent reasons": (1) the TFEAA does not reach "extraterritorial injuries"; (2) the counterclaim is "barred by the First Amendment and the *Noerr–Pennington* doctrine"; and (3) Profinity failed to introduce legally sufficient evidence of "a dangerous probability of monopolization and damages."

---

[11] We note that the record shows no party filed a motion for new trial in the trial court, nor does any party request on appeal that this case be remanded to the trial court for further proceedings as to breach of contract damages.

## a. Relief Under TFEAA

### i. Applicable Law

The purpose of the TFEAA is to "maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." TEX. BUS. & COM. CODE ANN. § 15.04. The provisions of the Act "shall be construed to accomplish this purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose." *Id*. Under section 15.05 (b), "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." *Id*. § 15.04(b). Further, section 15.25(b) states,

> No suit under this Act shall be barred on the grounds that the activity or conduct complained of in any way affects or involves interstate or foreign commerce. It is the intent of the legislature to exercise its powers to the full extent consistent with the constitutions of the State of Texas and the United States.

*Id*. § 15.25(b).

Based on those provisions, the Texas Supreme Court has concluded that "[t]he TFEAA does not, in clear language, afford a cause of action for injury outside the state." *Harmar*, 218 S.W.3d at 683. In *Harmar*, five carbonated soft drink bottlers (the "RCC franchisees") with franchises to distribute Royal Crown Cola in various territories within the "Ark-La-Tex region"[12] sued The Coca-Cola Company ("Coke") for using "calendar marketing agreements ("CMAs")[13] with retailers to unreasonably restrain trade, monopolize the market, and attempt and conspire to monopolize the market in violation of the TFEAA. *Id*. at 674. The trial court rendered judgment on the jury's verdict for the plaintiffs, awarding damages incurred throughout the region and

---

[12] The Ark-La-Tex region is described as "a four state region including parts of Arkansas, Louisiana, and Texas where the three borders meet, and also nearby southeast Oklahoma." *Id*. at 674. None of the five RCC franchisees operated entirely within Texas, and two operated entirely outside Texas. *Id*. at 675.

[13] "Generally speaking, a CMA provides that during stated periods of time a retailer will promote a wholesaler's products in preference to competing products in exchange for payments and price discounts from the wholesaler." *Id*. at 676.

permanently enjoining, in specified counties in each of the four states, certain conduct that it determined to be anticompetitive.[14] *Id*. The court of appeals affirmed. *Id*.

In the supreme court, Coke argued that the TFEAA did not allow the trial court to entertain an action for damages and injunctive relief based on injury that occurred in other states. *Id*. at 679–80. The RCC franchisees contended that the injuries they incurred outside Texas were actionable under the TFEAA because (1) those injuries resulted from Coke's conduct within Texas, specifically its business and policy decisions made at its offices in Texas and contract negotiations often handled in Texas, and (2) use of CMAs throughout a regional market that extended into Texas harmed consumers in Texas by affecting their ability to obtain the benefits of competition. *Id*. at 680.

The supreme court reasoned that pursuant to section 15.25(b), "[t]he mere involvement of interstate commerce does not permit a defendant to escape suit, but neither does it permit a plaintiff to sue." *Id*. at 682. Then, the supreme court stated in part,

> What the Act says, rather plainly we think, is that it is to be used to promote competition in Texas, even if the trade or commerce involved extends outside Texas; it does not say that it is to be used to promote competition outside Texas as long as the trade or commerce involved extends into Texas. This is consistent with section 15.25(b), which indicates that the Act's purpose of redressing injury in Texas is not to be defeated merely because the injurious conduct also occurred in other states. The provision does not extend the Act's purpose to promoting competition outside Texas, as by remedying extraterritorial injury, which would provide no benefit to consumers "in the state."

*Id*. at 683. The supreme court observed that "[t]he RCC franchisees do not argue that compensating them for injury suffered in Arkansas, Louisiana, and Oklahoma will promote competition in Texas or benefit Texas consumers," but rather "argue only that because Coke engaged in the same conduct in Texas and the other states and caused the same type of injury

---

[14] For the three franchisees operating in partly in Texas, "the verdict did not distinguish between damages incurred inside and outside of Texas." *Id*. at 678.

throughout the region, the Act affords relief for injury outside Texas." *Id*. The supreme court rejected that argument. *Id*. Further, the supreme court stated,

> The fact that Coke made decisions in Texas regarding the CMAs used in other states, negotiated some of those CMAs in Texas, and used the same CMAs in Texas does not bring redress of the resulting injury in the other states within the TFEAA's purpose. <u>Competition in Texas markets is not maintained or promoted, nor are Texas consumers benefited, by enjoining Coke from engaging in such conduct with respect to markets outside Texas or by awarding the RCC franchisees damages incurred in their operations outside Texas.</u>

*Id*. (emphasis added). That court concluded in part that "the TFEAA will not support extraterritorial relief in the absence of a showing that such relief promotes competition in Texas or benefits Texas consumers." *Id*. at 674. The supreme court reversed the judgment of the court of appeals and dismissed the plaintiffs' claims of injury occurring in other states.[15] *Id*. at 675.

### ii. Application of Law to Facts

Profinity contends that pursuant to *Harmar*, (1) "where the harmful conduct occurs *in Texas*, the TFEAA will apply—even if the trade or commerce affected by the conduct in Texas *extends outside Texas*" (emphasis original), and (2) [a]nticompetitive conduct *in Texas* by a monopolistic business *in Texas* directed at a competitor *in Texas* opens the doors for the harmed competitor to recover damages suffered as a result of that anticompetitive conduct, 'even if the trade or commerce involved extends outside of Texas.'" (emphasis original) (quoting *Harmar*, 218 S.W.3d at 683). Further, Profinity argues in part,

> Unlike the RCC franchisees' claim in Harmar, . . . Profinity's TFEAA claim is not based on "[OT's] . . . conduct with respect to markets outside Texas," nor is it based on "damages incurred in [Profinity's] operations outside Texas." All of [OT's] predatory conduct that formed the basis of Profinity's TFEAA claim—and the jury's verdict—was directed at Ertel and Profinity in Texas. The harm that Profinity suffered and the damages the jury awarded were based solely on [OT's] predatory conduct in Texas. [OT] is headquartered in Texas.

---

[15] Then, the supreme court proceeded to address "the RCC franchisees' claims of injury in Texas from Coke's use of CMAs in violation of the TFEAA." *Id*. at 688. That court concluded there was no evidence to support the required market harm as to those claims. *Id*. at 691.

Additionally, according to Profinity (1) "[w]hile the TFEAA may not compensate for conduct and injury outside of Texas, it certainly protects against conduct and injury in Texas despite the fact that online consumers necessarily hail from Texas and beyond"; (2) "[OT] conflates the damages Profinity suffered due to injury caused entirely by Texas-based conduct with a "state-by-state analysis" identifying the location of Profinity's lost online subscribers"; (3) "Profinity, the harmed competitor, is the entity bringing the antitrust claim—not the nationwide consumers who were unable to purchase its product online as a result of [OT's] Texas-based conduct"; (4) "[t]he fact that Profinity operates virtually and markets to consumers nationwide does not deprive Profinity's claims of the requisite Texas nexus" and (5) "[OT's] skewed reading of [*Harmar*] would render the TFEAA nearly toothless in an online economy."

> OT responds in part,
>
> Profinity's expert admitted that he did not do "a state-by-state analysis." Instead, his $1.8 million damages calculation was based on an alleged "nationwide" harm to Profinity. But nationwide damages may not be recovered under the TFEAA, because "[c]ompetition in Texas markets is not maintained or promoted, nor are Texas consumers benefited . . . by awarding [Profinity] damages incurred in [its] operations outside Texas." *Harmar*, 218 S.W.3d at 683.

Further, OT argues that "applying [*Harmar*'s] clear mandate would not render the TFEAA toothless." Specifically, according to OT, (1) "if a case involves anticompetitive conduct that occurs in Texas, and the effects are felt in Texas, a claim should lie under the TFEAA for the harm to the Texas market" and (2) "a plaintiff who does not operate entirely within Texas may still recover, but must first segregate in-state damages from those sustained outside of Texas."

As to Profinity's contention that its counterclaim is not based on "damages incurred in [its] operations outside Texas," we cannot agree. As described above, Profinity's expert at trial testified in part that Profinity's revenue "derives from signing up new subscribers" and therefore "lost subscribers" are "really what's at issue" in calculating or quantifying harm to Profinity from the alleged anticompetitive acts. Further, while Profinity contends "online consumers

–22–

necessarily hail from Texas and beyond," (1) Bell testified he did not do any analysis respecting how many of the 75,908 "lost subscribers" described by him were "lost to Profinity in the state of Texas" and (2) counsel for Profinity "concede[d]" at the hearing on OT's motion for JNOV in the trial court that "there is no explicit testimony . . . that [Profinity] lost a consumer in Texas."

Another contention of Profinity is that this case involves "[a]nticompetitive conduct *in Texas* by a monopolistic business *in Texas* directed at a competitor *in Texas*" (emphasis original). However, as described above, the supreme court stated in *Harmar* that "the TFEAA will not support extraterritorial relief in the absence of a showing that such relief promotes competition in Texas or benefits Texas consumers." *Id*. at 674. Profinity does not address, and the record does not show, how "[c]ompetition in Texas markets" would be maintained or promoted, or how Texas consumers would be benefitted, by the relief requested. *See id*. at 683. On this record, we cannot conclude the trial court erred by concluding as a matter of law that Profinity's counterclaim was not actionable under the TFEAA.

In this case, Profinity does not pray on appeal for a remand to segregate damages that were not "incurred in its operations outside Texas," nor does it suggest any possibility of segregating of its damages. However, we note the supreme court has concluded that in certain circumstances, an unsegregated damages award requires a remand. *See, e.g., Minn. Mining & Mfg. Co. v. Nishika Ltd*., 953 S.W.2d 733, 739 (Tex. 1997); *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1997); *see also Harmar*, 218 S.W.3d at 705–06 (Brister, J., dissenting) ("When the damages evidence included both proper and improper items, remand is required to allow segregation of the two."). Nevertheless, we need not consider the propriety of a remand in this case because we conclude below that the *Noerr–Pennington* doctrine would bar any claim for such damages.

b. Applicability of *Noerr–Pennington* Doctrine

i. Applicable Law

The "*Noerr–Pennington* doctrine" arose out of two U.S. Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). *See RRR Farms, Ltd. v. Am. Horse Protection Ass'n, Inc.*, 957 S.W.2d 121, 126 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). The doctrine has its roots in the First Amendment to the United States Constitution, which guarantees the "right of the people . . . to petition the government for a redress of grievances." *Id*. at 126–27. The doctrine provides immunity from "antitrust liability" to those who petition the government for redress and also bars claims based on conduct "incidental" to the prosecution of a lawsuit respecting such redress. *Noell v. City of Carrollton*, 431 S.W.3d 682, 708 (Tex. App.—Dallas 2014, pet. denied); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006). A claim of immunity based on the *Noerr–Pennington* doctrine is an affirmative defense. *RRR Farms*, 957 S.W.2d at 129.

Further, the Supreme Court has recognized that there might be certain instances in which the petitioning activity "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationship of a competitor" and the application of antitrust laws would be justified. *Id*. at 128 (quoting *Noerr*, 365 U.S. at 144). The "sham exception" to the *Noerr–Pennington* doctrine "covers those situations in which persons use the governmental *process*, as opposed to the *outcome* of the process, as an anti-competitive weapon." *Id*. (emphasis original); *see also id*. at 129 ("the sham exception is an affirmative defense to the [*Noerr–Pennington*] doctrine").

ii. Application of Law to Facts

Profinity argues that the *Noerr–Pennington* doctrine is inapplicable because its antitrust claim "is not premised on [OT's] lawsuit." Specifically, Profinity contends,

> Profinity has not alleged, and does not rely on a claim that the lawsuit is "objectively baseless" or otherwise a "sham." Rather, Profinity's counterclaim has always been based on [OT's] predatory conduct in using a departing employee—Chad Ertel—to lay a trap for a new competitor. The fact that [OT] ultimately sued Profinity as part of its overall anticompetitive scheme does not immunize [OT] from liability.
> . . . .
> Here, Profinity has not based its antitrust claim solely on [OT's] lawsuit, but instead has alleged independent conduct that can ground an antitrust claim (i.e., fraudulent conduct on the part of the defendant and specifically targeting a new competitor through deceptive means to eliminate the competition).

Further, Profinity states in its reply brief in this Court,

> [OT] understands this position—that the "sham litigation" test is inapplicable—as [OT] made this very argument previously in its antitrust claim against ConsumerInfo.com, Inc. . . . . Just as [OT's] antitrust claim was not based solely on ConsumerInfo.com's lawsuit but on an overall anticompetitive scheme, Profinity's claim is likewise not based on [OT's] lawsuit but on [OT's] predatory scheme that it put in play the moment Ertel announced his departure. The jury was not asked to determine whether [OT's] lawsuit or litigation conduct was monopolistic. Rather, the jury unanimously found that [OT] attempted to monopolize the relevant market for online credit monitoring "in connection with Defendant Chad Ertel's departure from its (OT's) employ. . . ." Because Profinity's antitrust claim is not premised on [OT's] lawsuit or conduct incidental to [OT's] lawsuit, the *Noerr–Pennington* doctrine does not apply.

Additionally, in a footnote in its reply brief in this Court, Profinity argues "judicial estoppel" precludes OT "from asserting any positions that are inconsistent with its arguments in response to ConsumerInfo.com's Motion to Dismiss or Motion for Partial Summary Judgment."[16]

---

[16] All of Profinity's arguments described above were asserted by it in the trial court. Additionally, Profinity argues for the first time on appeal that "even if the *Noerr–Pennington* doctrine applied, the 'sham litigation' test would strip [OT] of any immunity from antitrust liability." Because the record does not show Profinity asserted that argument in the trial court, we conclude that argument presents nothing for this Court's review. *See* TEX. R. APP. P. 33.1.

OT contends in part that Profinity's antitrust claim "is based upon being sued" and therefore "the First Amendment protects the right to petition the government—and thus immunizes [OT's] lawsuit from antitrust liability."

The record shows that in the *ConsumerInfo.com* lawsuit[17] described by Profinity, OT alleged in part that a competitor, ConsumerInfo.com, "improperly obtained a federal trademark registration for 'FREECREDITREPORT.COM' by fraudulently concealing the fact that its purported mark is actually used in connection with the provision of free credit reports and instead misrepresenting that the mark is used in connection with services such as credit monitoring." Further, OT asserted in a brief in opposition to ConsumerInfo.com's motion to dismiss in that case (1) "[i]n light of ConsumerInfo.com's attempts to enforce this knowingly fraudulently-obtained mark, [OT] has properly alleged a textbook case of antitrust violation by fraud on the [Patent and Trademark Office]"; (2) "[OT] has not based its antitrust claim solely on ConsumerInfo.com's lawsuit, but cites to the litigation both as part of an overall course of anticompetitive conduct and because it is ConsumerInfo.com's attempt to enforce its fraudulently-obtained trademark registration"; (3) "ConsumerInfo.com has also used its dominant market position, obtained through the enforcement of its fraudulently-obtained mark, to unfairly exclude competitors from marketing channels and, thus, the market"; and (4) "[i]t is this entire course of conduct which evidences ConsumerInfo.com's antitrust violations." Additionally, OT argued in part,

> ConsumerInfo.com's challenge of [OT's] antitrust claim misunderstands the nature of that claim. ConsumerInfo.com claims protection under the *Noerr–Pennington* doctrine, arguing that [OT] must show that this lawsuit is "objectively baseless" in order to state an antitrust claim, and that it cannot do so because ConsumerInfo.com obtained a federal trademark registration for FREECREDITREPORT.COM. In actuality, [OT's] claim is based on the well-established body of law recognizing that a Section 2 Sherman Act claim may be

---

[17] *See ConsumerInfo.com, Inc. v. Chang*, No. CV 09-3783-VBF (C.D. Cal. June 30, 2011).

premised on allegations that the defendant improperly obtained a federal trademark registration and is attempting to restrain competition through the enforcement of such fraudulent registrations. This is precisely what [OT] alleges.

In the case before us, the facts do not involve allegations of a fraudulently obtained trademark registration or an attempt to enforce such registration. Therefore, to the extent Profinity contends OT is improperly maintaining a position "inconsistent" with its position in *ConsumerInfo.com*, we cannot agree.

Further, we disagree with Profinity's assertions that it "has alleged independent conduct that can ground an antitrust claim" and its claim "is not premised on [OT's] lawsuit or conduct incidental to [OT's] lawsuit." Profinity does not explain, and the record does not show, how, without the filing of this lawsuit, Profinity would have been "hindered" by any of the alleged representations to Ertel. In fact, during oral submission before this Court, counsel for Profinity was asked, "How was Profinity adversely affected, let's say, in the absence of litigation?" Counsel for Profinity responded in part, "It wouldn't have been, in the absence of litigation." Additionally, the cases cited by Profinity in support of its position involve conduct that had an anticompetitive aspect independent of litigation and are therefore inapposite. *See W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010) (hospital system alleged competing hospital system and health insurer formed unlawful conspiracy to protect one another from competition); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (radio station's competitors allegedly misrepresented to advertisers that they could reach entire area using rival's network); *Gen. Motors Corp. v. Johnson Matthey, Inc.*, 887 F. Supp. 1240, 1246 (E.D. Wis. 1995) (compelling discovery respecting environmental lobbying activities sought for limited purpose of establishing auto maker's motives in engaging in alleged defamation and misappropriation of trade secrets); *Byars v. Bluff City News Co.*, 609 F.2d 843, 854 & n.30 (6th Cir. 1979) (local distributor of periodicals claimed regional distributor refused to

do business with him and waged campaign of "dirty tricks" against him, including removal of his periodicals from racks, below cost pricing, and other "predatory conduct"); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965) (maintenance and enforcement of a patent obtained by fraud). On this record, we conclude the trial court did not err by concluding as a matter of law that the *Noerr–Pennington* doctrine bars Profinity's antitrust counterclaim.

In light of our conclusions above, we decide Profinity's issue against it. Further, based on the supreme court's disposition of the complaints in *Harmar* that it concluded were not actionable under the TFEAA, we dismiss Profinity's TFEAA claim for lack of jurisdiction. *See Harmar*, 218 S.W.3d at 675, 691.

### III. CONCLUSION

We decide against Profinity on its issue and against OT on its cross-issue. We vacate the portion of the trial court's judgment granting OT's motion for JNOV as to Profinity's counterclaim and render judgment dismissing that counterclaim for lack of jurisdiction. *See id*. The trial court's judgment is otherwise affirmed.


140403F.P05


/ Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PROFINITY, LLC, Appellant

No. 05-14-00403-CV     V.

ONE TECHNOLOGIES, L.P.,
Appellee/Cross-Appellant
               V.
CHAD D. ERTEL, Cross-Appellee

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 12-03980-A.
Opinion delivered by Justice Lang, Justices
Lang-Miers and Fillmore participating.

In accordance with this Court's opinion of this date, we **VACATE** the portion of the trial court's judgment granting Appellee/Cross-Appellant One Technologies, L.P.'s motion for JNOV as to Appellant Profinity LLC's counterclaim and **RENDER** judgment **DISMISSING** that counterclaim for lack of jurisdiction. The judgment of the trial court is otherwise **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 17th day of December, 2015.